# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

**TONY VON CARRUTHERS,**

**Plaintiff**

**v.**

**JONATHAN SKRMETTI, Attorney General, Tennessee, HEIDI KUHN, Shelby County Clerk of Court, STEVE MULROY, Shelby County District Attorney, CERELYN DAVIS, Chief, Memphis Police Department, DAVID RAUSCH, Director, Tennessee Bureau of Investigation, DR. SCOTT COLLIER, Chief, Shelby County Medical Examiner, FRANK STRADA, Commissioner, Tennessee Department of Correction, and KENNETH NELSON, Warden, Riverbend Maximum Security Institution, each in their official capacity,**

**Defendants.**

**Case No:** _____

**CAPITAL CASE**

<span style="color:red">**EXECUTION SCHEDULED MAY 21, 2026**</span>

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983</u>

Lucas Cameron-Vaughn, Esq.
TN BPR No. 036284
ACLU of Tennessee
P.O. Box 120160
Nashville, Tennessee 37212
(615) 645-5067
lucas@aclu-tn.org

Maria DeLiberato, Esq.*
American Civil Liberties Union
201 W. Main St. Suite 402
Durham, NC 27701
(717) 503-2730
mdeliberato@aclu.org

QUARLES & BRADY LLP

Melanie C. Verdecia, Esq.*
(pro hac vice forthcoming)
101 East Kennedy Blvd., Suite 3400
Tampa, FL 33602
melanie.verdecia@quarles.com

*_Pro Hac Vice_ Forthcoming

1

<u>**COMPLAINT FOR DECLARATORY AND**</u>
<u>**INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983**</u>

Pursuant to 42 U.S.C. § 1983, Plaintiff Tony Von Carruthers, a prisoner under sentence of death, hereby sues Defendants, Jonathan Skrmetti, Heidi Kuhn, Steve Mulroy, Cerelyn Davis, David Rousch, Dr. Scott Collier, Frank Strada, and Kenneth Nelson, each in their official capacity (collectively, the "**State Actors**"), and states:

**INTRODUCTION**

1.      For thirty years, Mr. Carruthers—who the State of Tennessee intends to execute in less than thirty days—has steadfastly insisted that he was not responsible for the 1994 kidnapping murders of Frederick Tucker, Marcellos Anderson, and Delois Anderson. Absent judicial intervention, Tennessee will execute Mr. Carruthers next month without allowing him the opportunity to test available and probative fingerprint evidence that could prove his innocence.[1]

2.      Mr. Carruthers' conviction is based entirely on circumstantial evidence, including testimony from a secretly paid informant, several convicted felons, and the medical examiner's false and discredited testimony. No physical evidence links Mr. Carruthers to the murders.

3.      Not only was the State's evidence against Mr. Carruthers weak, but Mr. Carruthers' trial was manifestly unfair. Mr. Carruthers was forced to represent himself at his capital trial, without even standby counsel, despite his repeated requests for counsel. Mr. Carruthers' forced self-representation was so prejudicial that, on appeal, Mr. Carruthers' co-defendant, James

---

[1] As of the filing of this Complaint, Mr. Carruthers also has a request for DNA testing pending at the Tennessee Supreme Court. If that claim is denied, then Mr. Carruthers reserves the right to amend this Complaint to assert claims related to that denial.

Montgomery,[2] received a new trial. On remand, Mr. Montgomery was offered and accepted a plea to reduced charges and has been a free man for over a decade. *See infra* note 9.

4. Before his release, in 2010, Mr. Montgomery told Mr. Carruthers' federal investigators that Mr. Carruthers was not involved in the crimes and, instead, Mr. Montgomery enlisted a third party, Ronnie "Eyeball" Irving, to assist him in kidnapping and murdering the victims.

5. After technology evolved and with the support of Tennessee law allowing forensic testing in this situation, Mr. Carruthers sought access to relevant and probative evidence in the Defendants' possession—cloth bindings from the victims' bodies, fingernail scrapings from the victims, unidentified fingerprints from the scene of the kidnapping, and an unknown male DNA profile located on a blanket buried with the victims—so that they could be tested to confirm his innocence.[3] At the least, the testing would support a more lenient sentence, as Mr. Montgomery received.

6. This action challenges Tennessee's Post-Conviction Fingerprint Analysis Act of 2021 (the "**Fingerprint Act**") both on its face and as applied to Mr. Carruthers by the State courts.

---

[2] The State originally indicted three men for the murders: Tony Carruthers, James Montgomery, and Jonathan Montgomery. Jonanthan Montgomery, the brother of co-defendant James Montgomery, was found hanged in his cell prior to trial. *Carruthers*, 35 S.W.3d at 524 n.2.

[3] Mr. Carruthers' filed a pro se Motion for Fingerprint testing in 2021. The State, through the Attorney General, filed a response in opposition on December 23, 2025. Mr. Carruthers' federal counsel filed a Reply to the State's Response, adopting and amending the original request. A true and correct copy of Mr. Carruthers' Reply to the State's Response (the "**Fingerprint Motion**") filed on January 2, 2026, is attached as **Exhibit A**. The appendix to that filing is attached as **Exhibit B**. A true and correct copy of Mr. Carruthers' *Motion for Post-Conviction DNA Testing and Request to Appoint a Special Master Pursuant to Tenn. S. Ct. R. 12.4(E)* filed April 9, 2026 (the "**DNA Motion**") is attached as **Exhibit C**. The appendix to the DNA Motion is attached as **Exhibit D** and cited as "DNA App'x." A true and correct copy of the State's response to the DNA Motion is attached as **Exhibit E** and cited as "DNA Opp."

3

7. Against clear statutory authority and in violation of Mr. Carruthers' constitutional rights, the State denied Mr. Carruthers' requests. By unreasonably denying Mr. Carruthers reasonable access to the forensic evidence that can support a meritorious challenge to his conviction and death sentence, Defendants have deprived Mr. Carruthers of reasonable and effective use of the post-conviction relief procedures that Tennessee has chosen to make available to its convicted citizens under state law. *See, e.g.*, *Guitierrez v. Saenz*, 606 U.S. 305 (2025); *Skinner v. Switzer*, 562 U.S. 521 (2011); *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009). Accordingly, this suit seeks to address Defendants' violations of Mr. Carruthers' constitutional right to due process by denying him access to the evidence for forensic testing ahead of his impending execution.

**PARTIES**

8. Plaintiff Tony Carruthers is a citizen of the United States and resident of Tennessee. He is currently incarcerated by the Tennessee Department of Corrections at Riverbend Correctional Facility in Nashville, Tennessee under a sentence of death issued by the Shelby County Criminal Court. He is scheduled to be executed on May 21, 2026.

9. Defendant is the Jonathan Skrmetti is the Attorney General of Tennessee and is responsible for prosecuting Mr. Carruthers. He is being sued in his official capacity.

10. Defendant Heidi Kuhn is the Shelby County Clerk of Court and is in possession of the evidence introduced at trial. She is being sued in her official capacity.

11. Defendant Steve Mulroy is the Shelby County District Attorney and his office prosecuted Mr. Carruthers and Mr. Montgomery at trial. A district attorney who opposes forensic testing is a proper defendant in a section 1983 action seeking such testing. *See Skinner*, 562 U.S. 521. He is being sued in his official capacity.

4

12.     Defendant Cerelyn Davis is the Chief of the Memphis Police Department and is in possession of latent fingerprint cards, crime scene photos and videos, and fingerprints of the alternate suspect. She is being sued in her official capacity.

13.     Defendant David Rausch is the Director of the Tennessee Bureau of Investigation, which has access to the Automated Fingerprint Information System ("**AFIS**") and is in possession of results from previous DNA testing, including the unknown male DNA profile from a blanket at the crime scene. He is being sued in his official capacity.

14.      Defendant Dr. Scott Collier is the Chief Medical Examiner for Shelby County and is in possession of DNA and fingerprint standards for the alternate suspect as well as fingernail scrapings of the victims. He is being sued in his official capacity.

15.     Defendant Frank Strada is the Commissioner for the Tennessee Department of Corrections and is responsible for carrying out the execution of Tony Carruthers. He is being sued in his official capacity.

16.     Defendant Kenneth Nelson is the Warden of Riverbend Maximum Security Institution and is responsible for supervising the execution of Tony Carruthers He is being sued in his official capacity.

### JURISDICTION AND VENUE

17.     The Court has jurisdiction over the claims brought in this action under 28 U.S.C. §§ 1331, 1343, 2201, and 42 U.S.C. § 1983. *See also Skinner v. Switzer*, 562 U.S. 521, 534 (2011).

18.     Venue is proper under 28 USC § 1391(b)(2) because Mr. Carruthers is incarcerated in this District and his execution is scheduled to occur in this District. Likewise, the State Actors are all engaged in the actions at issue in this District, and several of the State Actors are residents of the District.

5

**STATEMENT OF FACTS**

19.     Mr. Carruthers is one of three men who were indicted for the kidnapping and murders of Marcellos "Cello" Anderson, his mother Delois Anderson, and Frederick Tucker. *State v. Carruthers*, 35 S.W.3d 516, 524 (Tenn. 2000).

20.     The other two men who were indicted are Jonathan Montgomery and his brother James Montgomery. *See supra* note 2. Mr. Carruthers is the only one of the three men who remains under sentence of death for these crimes, which he has consistently maintained he did not commit. Jonathan Montgomery died in jail before trial, and James Montgomery was released after his original death sentence and conviction were overturned, and he entered a more favorable agreement for a term of years. *Carruthers*, 35 S.W.3d at 524.

> **A. After Mr. Carruthers' codefendant Jonathan Montgomery led police to the victims' bodies, police obtained critical evidence from the crime scenes that is available for forensic testing.**

21.     On March 3, 1994, approximately a week after Ms. Anderson was reported missing, the victims' bodies were found in a grave in a Memphis cemetery. *Id.* Jonathan Montgomery ultimately led authorities to the victims' bodies, which led police to James Montgomery. Jonthan gave inconsistent statements to police from the beginning, but after several unrecorded interrogation breaks and across multiple days, Jonthan ultimately told police that he, James, and Mr. Carruthers were present at the gravesite when the victims were killed, but that neither James nor Mr. Carruthers killed anyone. Instead, Jonathan told police it was a man named Bobby Wilson who was the actual killer.[4] (*See* DNA Opp., Attachment 1 (Jonathan Montgomery Statements).)

---

[4] At a hearing on a motion to suppress Jonathan Montogmery's statements, Memphis Police Sgt. Roleson testified that Mr. Wilson was wanted for a different Memphis homicide, the January 19, 1994 shooting death of Marlin Webb and that he believed Wilson was on the run at the time of the murders. Transcript of December 15, 1994 Motion to Suppress (attached as **Exhibit F**), at 39.

6

22. The victims' bodies were found on top of one another, underneath a piece of plywood that was underneath a casket. Mr. Anderson's hands were bound behind his back with cloth ties. Mr. Tucker was bound with cloth ties at his hands and feet. Ms. Anderson had two red socks knotted together wrapped around her neck, and one arm was tied behind her back with a pair of knotted pantyhose. (DNA App'x, at Ex. 1 (1996 Trial Transcript, Vol. 13, p. 1864-1867).)

23. From the gravesite, police collected critical evidence, including the fabric bindings that were used on the victims. The medical examiner collected fingernail scrapings from all three victims.

24. Police also searched Ms. Anderson's house, where they collected six latent prints suitable for comparison, including prints from the doorknobs and the phone receiver—items which the suspected perpetrator likely touched. Specifically, the State presented evidence at trial that someone answered the phone when her niece telephoned the residence but failed to speak. *Carruthers*, 35 S.W.3d at 526.

25. Mr. Carruthers and Mr. Montgomery were excluded from all of the prints collected at the scene.

   **B. The State's case against Mr. Carruthers was based entirely on unreliable circumstantial evidence and capitalized on Mr. Carruthers' forced self-representation.**

26. The State's entire case against Mr. Carruthers—from the beginning—has been based on circumstantial evidence. No forensic evidence has ever linked Mr. Carruthers to the crime. *Carruthers*, 35 S.W.3d at 523-72 (established by omission). There were no eyewitnesses to the murder. *Id.*

27. The State's case against Mr. Carruthers was originally dismissed in General Sessions Court for lack of evidence. (*See* DNA App'x, Ex. 2.)

28.     It was only after the State enlisted the services of a career paid snitch named Alfredo Shaw, who testified to Mr. Carruthers' purported confession, that the State was able to secure an indictment and proceed with its case against Mr. Carruthers. (*See* DNA App'x, Ex. 3 (Crimestoppers Report (April 3, 1994)).)

29.     The State's original theory for prosecuting Mr. Carruthers was based on Mr. Shaw's grand jury testimony that two brothers, Jerry and Terry Durham, hired Mr. Carruthers to commit the three murders for $100,000 and a kilogram of cocaine (DNA App'x, Ex. 4.) But before trial, Mr. Shaw recanted his grand jury testimony in a TV news statement where he confessed that the police paid him to testify against Mr. Carruthers. (*See* Shaw Interview Tr.)[5]

30.     The State's ultimate theory at trial was that Mr. Carruthers, along with James and Jonathan Montgomery (*see supra* note 2), kidnapped Marcellos Anderson to rob him. *Carruthers*, 35 S.W.3d at 524.[6] At trial, the State relied almost entirely on the testimony of convicted felons and paid informants, including:

a.     Jimmy Lee Maze Jr., "a convicted felon," testified that he had received two letters from Mr. Carruthers about a "master plan" to "make those streets pay me." *Carruthers*, 35 S.W.3d at 524. Mr. Maze then recounted a conversation he purportedly had with Mr. Carruthers discussing plans for the kidnapping. *Id.*

b.     Charles Ray Smith, a convicted felon who met Mr. Carruthers in prison, testified that Mr. Carruthers had commented to him, while working together on a prison

---

[5] Alfredo Shaw's TV interview on February 28, 1996, was introduced as Ex. 5 (transcript) and Ex. 9 (video) to Mr. Carruthers' Response to Motion to Set Execution Date (Dec. 30, 2019), in *State v. Carruthers*, No. W1997-00097-SC-DDT-DD. That filing is attached here as **Exhibit G**. The transcript of Mr. Shaw's interview is cited as "Shaw Interview Tr."

[6] Marcellos Anderson was "heavily involved in the drug trade" and known to carry large amounts of cash and valuables. *Carruthers*, 35 S.W.3d at 524.

8

work detail in a cemetery, that hiding a body under the grave of another would be a good way to dispose of a corpse. *Id.*

      c.      Mr. Shaw, a career paid snitch, testified that Mr. Carruthers confessed to him while in jail. *Id.* at 528–29. This was the *only* putative "confession" in this case and was later recanted. *See supra* ¶ 20.

31.      The State's remaining evidence against Mr. Carruthers was circumstantial at best. For example, Nakeita Shaw testified that she witnessed Mr. Carruthers and James Montgomery at her home on the night of the kidnappings. *Carruthers*, 35 S.W.3d at 526. Without more, however, this testimony did little to inculpate Mr. Carruthers and it has never been asserted that Mr. Carruthers was unacquainted with the Montgomery brothers.

32.      Further, Chris Hines testified that Jonathan Montgomery beeped him and said "[m]an, a n——r got them folks," apparently meaning "Cello and them." *Id.* at 526. But this testimony also does not inculpate Mr. Carruthers; it merely shows that Jonathan Montgomery had knowledge of the murders, which was clear since he led police to the bodies.

33.      The State also told the jury, based on the testimony of medical examiner Dr. O.C. Smith, that the victims were buried alive. *Carruthers*, 35 S.W.3d at 527. This damaging and later-disavowed narrative was one of the primary arguments in support of a death sentence:

> Grossly wicked, reprehensible, odious, and vile. That's what happened that night. That's what happened. This woman, Delois Anderson, is in a grave, in a pit, alive.

> She is there in that grave breathing in her last breath and the irony -- it's not irony. The tragedy of it is that as she actually breathed in her last breath she was in effect killing herself, bringing things into her body, dirt being on top of her. What worse could you have?

1994 Trial Tr. Vol. 18, p. 2775-76 (attached as **Exhibit H**).

34.      At trial, despite several requests for counsel, Mr. Carruthers was forced to represent himself. As a result, the jury never heard about significant evidence supporting Mr. Carruthers'

9

innocence. For instance, Mr. Carruthers' jury never heard about the fingerprints obtained from Ms. Anderson's house on items that were handled by the offender—much less that the State had obtained unidentified prints, or that Mr. Carruthers and Mr. Montgomery were excluded from the prints.

35.     After being tried together, both Mr. Montgomery and Mr. Carruthers were convicted and sentenced to death.

**C.  While Mr. Montgomery was granted relief on appeal and ultimately released after serving a shorter sentence, the State intends to execute Mr. Carruthers without completing forensic testing that could prove his innocence.**

36.     On direct appeal, the Tennessee Supreme Court affirmed Mr. Carruthers' conviction and sentence but determined that Mr. Montgomery was so prejudiced by Mr. Carruthers' forced self-representation that he was entitled to a new trial. *Carruthers*, 35 S.W.3d at 553–54 (reversing Mr. Montgomery's conviction and death sentence because "the record demonstrates that Montgomery was severely prejudiced by Carruthers' self-representation").

37.     In federal habeas, Mr. Carruthers was represented by the Capital Habeas Unit of the Federal Defender ("CHU"), by the Middle District of Tennessee Capital Habeas Unit. Through counsel, Mr. Carruthers alleged that he was denied his Sixth Amendment right to counsel in violation of *United States v. Cronic*, 466 U.S. 648 (1984), and that he was incompetent to stand trial or represent himself.[7] The federal district court rejected Mr. Carruthers' claims as procedurally barred. *See Carruthers v. Mays*, 889 F.3d 273, 287 (6th Cir. 2018).

---

[7] Mr. Carruthers' federal counsel filed a claim under *Ford v. Wainwright*, 477 U.S. 399 (1986), that Mr. Carruthers is incompetent to be executed. The Shelby County Criminal Court rejected that claim. An appeal of that denial is currently pending before this Court in *Carruthers v. State*, W1997-00097-SC-DDT-DD.

38.     On appeal, the U.S. Court of Appeals for the Sixth Circuit affirmed the district court's denial. *See generally id.* In doing so, the Sixth Circuit emphasized that its ruling was under the constraints of AEDPA, and observed:

> Nothing in this opinion is intended to bless the state trial court's actions or the merits of the Tennessee Supreme Court's opinions affirming those actions. Despite Carruthers's mistreatment of his own counsel, it is still troubling that the state trial court, after several hearings at which Carruthers was effectively unrepresented, required Carruthers to proceed pro se through his capital murder trial without giving him the warnings typically required in the distinct context of a defendant's affirmatively waiving his right to counsel.

*Id.* at 280.

39.     In September 2019, the State moved to set an execution date. A true and correct copy of the State's motion is attached as **Exhibit I**.

40.     On December 30, 2019, Mr. Carruthers, represented by the CHU, responded in opposition to the State's motion, presenting evidence of innocence not disclosed at trial, alleging prosecutorial misconduct, and asserting Mr. Carruthers' lack of competency to be executed, among other claims. *See generally* Ex. F.

41.     On September 30, 2025, the Tennessee Supreme Court granted the State's Motion and set Mr. Carruthers' execution for May 21, 2026, at 10:00 a.m. A true and correct copy of the Order is attached as **Exhibit J**.

### D. Significant forensic and evidentiary developments since trial further undermine the State's circumstantial case against Mr. Carruthers.

#### i.     *Forensic testing conducted on forensic evidence before James Montgomery's re-trial affirmatively excluded Mr. Carruthers.*

42.     As part of his re-trial proceedings, Mr. Carruthers' co-defendant James Montgomery secured forensic testing on multiple pieces of physical evidence collected from the crimes scenes. In 2003, forensic testing was conducted on items including the victims' clothing; a

11

white blanket found with the victims' bodies; cloth ties; and a vaginal swab. The testing revealed several pieces of critical information. (Keel Aff., Attachment 2).[8])

43.     First, the testing did not reveal any DNA matches to Mr. Montgomery or Mr. Carruthers. (Keel Aff., at 5-6.) A majority of the samples were either too small to produce a profile under 2003 technology, were inconclusive, or matched the victims. *Id.* at 5. However, there was one robust male profile on a white blanket that was buried with the victims. *Id*. Mr. Carruthers, Mr. Montgomery, and the male victims were excluded as a source of the DNA. *Id*. The unknown male profile was suitable for upload into the Combined DNA Index System (CODIS) database. *Id*. at 6. The last report Mr. Carruthers obtained, through a request under James Montgomery's case, was in 2019 and indicated that there were no hits in CODIS. DNA App'x, Ex. 7 (2019 CODIS Report.)[9]

> ii.     *In 2024, after decades of denying it, the State finally revealed Alfredo Shaw's status as a paid government informant.*

44.     For thirty years, the State withheld information about Alfredo Shaw's status as a paid government informant. It did so despite repeated requests for exculpatory and impeachment materials. While withholding that type of bias evidence is always improper, the State's conduct was particularly egregious here because Alfredo Shaw himself had admitted in a confession to the media that he had been paid by the police for falsely implicating Mr. Carruthers. The State's longtime suppression of the truth undermined that otherwise impactful recantation.

---

[8] The Affidavit of Alan Keel is attached at DNA App'x, Ex. 6 and cited herein as "Keel Aff."

[9] In the wake of the release of the DNA results, the State offered and Mr. Montgomery accepted an *Alford* plea to a reduced charge of three counts of second-degree murder. *See North Carolina v. Alford*, 400 U.S. 25 (1970). Mr. Montgomery was sentenced to twenty-seven years in prison on each count, to be run currently, and was released in late 2015. (*See* DNA App'x, Ex. 8.)

45. Prior to trial, Alfredo Shaw went to the media and admitted that his grand jury testimony was false and given only as a result of pressure and payment from the State Attorney and law enforcement. (*See* Shaw Interview Tr.)

46. At trial, Mr. Carruthers, forced to act as his own counsel, called Mr. Shaw to the stand to admit his recantation from the media interview. Prior to calling Mr. Shaw, the Court called in Mr. Shaw's counsel and, in open court, threatened Mr. Shaw with perjury charges if he repeated his recantation from the media interview: "The State has indicated that if that is indeed his testimony today, then they plan to seek indictments for aggravated perjury in both of those instances." (DNA App'x, Ex. 13 (1996 Trial Transcript, Vol. 14, p. 2128).) After meeting with his client, Mr. Shaw's lawyer reported that Mr. Shaw would "testify that what he has testified before was all true and correct." (DNA App'x, Ex. 13 (1996 Trial Transcript, Vol. 14, p. 2136).)

47. Mr. Shaw kept his lawyer's promise and repeated for the jury the "confession" that Mr. Carruthers purportedly gave him. (DNA App'x, Ex. 14 (1996 Trial Transcript, Vol. 15, p. 2174-78).) Mr. Carruthers, acting *pro se*, attempted to discover if Mr. Shaw was a paid informant. The prosecutor successfully objected to the question and kept the jury from learning the truth. (DNA App'x, Ex. 14 (1996 Trial Transcript, Vol. 15, p. 2554).)

48. In post-conviction, through counsel, Mr. Carruthers continued his quest to prove that Mr. Shaw was indeed a paid informant for the State. (*See* DNA App'x, Exs. 9-25).

49. Finally, on May 9, 2024, following the December 1, 2022 opening of the Shelby County District Attorney's Justice Review Unit, the Shelby County Criminal Court, Division V, ordered the Memphis Police Department to provide information regarding Mr. Shaw's employment as a confidential informant to the Shelby County District Attorney's Justice Review Unit (DNA App'x, Ex. 26.)

50.     On August 6, 2024, decades after Mr. Carruthers' trial, Assistant District Attorney Kevin Rardin provided Mr. Carruthers' counsel with more than 20 pages of information confirming Mr. Shaw's employment as a confidential informant. (*See* DNA App'x, Ex. 27.) The documents included signed confidential agreements between Mr. Shaw and law enforcement dating back to mid-1980s and ledgers of payments to Mr. Shaw continuing until at least 2003. *Id.*

51.     Of course, Mr. Carruthers' jury *never* heard about Mr. Shaw's inherent bias due to his employment by the State as a confidential informant.

### iii.     Trial testimony from the medical examiner that victims were buried alive has been proven false.

52.     Since Mr. Carruthers' trial, it has become clear that there was no scientific basis for the State's theory that the victims were buried alive. Dr. Smith himself has disavowed this conclusion. (DNA App'x, Ex. 28 (Aff. of Dr. O.C. Smith ("I will no longer sustain an opinion, as I did in my original testimony, that to a reasonable degree of medical certainty, the victims were in fact alive at the time they were buried beneath the coffin.")); DNA App'x, Ex. 29 (Testimony of Dr. Cleland Blake and Dr. George Nichols (post-conviction expert testimony that there was no scientific basis for Dr. Smith's trial testimony)).

53.     Yet, even after this theory was disavowed, the State continued to perpetuate this false narrative. And this false narrative has shaped public perception of this case. *See, e.g.*, Evan Mealins, *Tennessee Supreme Court sets 2026 execution dates for Christa Pika, three others*, The Tennessean (Oct. 1, 2025), https://perma.cc/VG3H-KZ72 (claiming Carruthers was convicted of "burying alive three people"); WREG Staff, *Memphis man convicted of triple murder goes from death row to freedom*, WREG (Sept. 26, 2016), https://wreg.com/news/memphis-man-convicted-

of-triple-murder-goes-from-death-row-to-freedom/ (recounting co-defendant Montgomery's release from prison and conviction for burying the victims alive).[10]

### *iv. In 2010, James Montgomery gave a statement exonerating Mr. Carruthers and inculpating an alternate suspect.*

54. In 2010, Mr. Carruthers' co-defendant James Montgomery, while serving the remainder of his reduced sentence, gave a statement to an investigator with the Capital Habeas Unit indicating that he kidnapped two of the victims, Marcellos and Fred, and then dispatched Ronnie "Eyeball" Irving to kidnap Ms. Anderson. Mr. Montgomery also confirmed to the investigator that Mr. Carruthers was not involved in the kidnapping or the murders.

55. Mr. Irving was murdered in 2002, and his fingerprints and a DNA sample are on file at the medical examiner's office. However, the unidentified physical evidence (the latent fingerprints or unknown male DNA profile) has not been compared to Mr. Irving's profile despite Mr. Montgomery's statement that Mr. Irving was a perpetrator of these crimes.

56. In other words, the State has refused—for 15 years—to compare existing samples to the evidence in this case that could prove Mr. Carruthers' innocence, consistent with Mr. Montgomery's statement in 2010.

---

[10] Indeed, in its recent Response in Opposition to Mr. Carruthers' requests for forensic testing in state court, the State continues to assert this false narrative. A true and correct copy of the State's brief in the appeal of the Fingerprint Motion is attached as **Exhibit K**.

**E.    Tennessee law sets forth specific procedures for post-conviction fingerprint and DNA testing.**

### i.    Tennessee's Post-Conviction DNA Analysis Act of 2001

57.    The Post-Conviction DNA Analysis Act of 2001 (the "**DNA Act**") offers litigants two paths to testing, one is discretionary and the other is mandatory. Tenn. Code. Ann. § 40-30-304; Tenn. Code. Ann. § 40-30-305.

58.    First, pursuant to Tenn. Code. Ann. § 40-30-304, the Court *shall* grant testing if the following four prongs are met:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

59.    Second, pursuant to Tenn. Code. Ann. § 40-30-305, the Court *may* grant testing if the following four prongs are met:

(1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

16

(3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

60.     There are no statutory time limits for requesting testing, and a petitioner cannot waive the right to DNA analysis under the Act by implication. *See Griffin v. State,* 182 S.W.3d 795, 799 (Tenn. 2006). The third prong expressly permits retesting when the evidence was not subjected "to the analysis that is now requested." Tenn. Code. Ann. §40-30-305 (2024).

61.     The DNA Act was created to serve two purposes: "first, to aid in the exoneration of those who are wrongfully convicted and second, to aid in identifying the true perpetrators of the crimes." *Powers v. State*, 343 S.W. 3d 36, 51 (Tenn. 2001).

### ii.     Tennessee's Post-Conviction Fingerprint Analysis Act of 2021

62.     Similar to the DNA Act, the Fingerprint Act also offers litigants two paths to testing, one discretionary and the other mandatory.

63.     The requirements for mandatory testing under the fingerprint statute are as follows:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis;

(2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;

(3) The evidence was never previously subjected to fingerprint analysis, and was not subjected to the analysis that is being requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and

17

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-404.

64. The requirements for testing under the permissive section are the same except for the first prong, which requires showing "[a] reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." Tenn. Code Ann. § 40-30-405.

## F. Mr. Carruthers' Several Requests for Forensic Testing

### i. Mr. Carruthers initially sought post-conviction fingerprint testing in 2021.

65. On September 21, 2021, Mr. Carruthers, acting *pro se*, filed a petition for fingerprints analysis pursuant to Tenn. Code Ann. 40-30-401 (2021), *et seq*. The Federal Public Defender for the Middle District of Tennessee subsequently filed a notice of intent to represent Mr. Carruthers in his request for fingerprint testing.

66. On February 2, 2022, the Shelby County District Attorney responded in opposition to Mr. Carruthers's *pro se* pleading. On December 23, 2025, the Attorney General, having assumed prosecution of the case, filed another opposition, alleging that even if the fingerprints identified a third party, that would not preclude Mr. Carruthers' involvement in the crimes underlying Mr. Carruthers' convictions and death sentence. The State also argued that none of the other new evidence in the intervening three decades was relevant and, therefore, should not be considered in determining whether testing was appropriate under either standard in the Fingerprint Act.

67. In January of 2026, the Public Defender filed a Reply/Amendment of the *pro se* motion to the State's December 2025 opposition. (*See generally* Exs. A-B.) Through counsel, Mr.

Carruthers sought the evaluation and comparison of the six unidentified prints taken from the Ms. Anderson's home, specifically asking the prints to be run in AFIS and to be compared to Mr. Irving's prints. (*See generally* Exs. A-B.)

68. On January 16, 2026, the Shelby County Criminal Court dismissed the request for fingerprint testing without an evidentiary hearing.

69. On April 16, 2026, the Tennessee Court of Criminal Appeals affirmed the postconviction court's denial of Mr. Carruthers' request for fingerprint testing. A true and correct copy of that opinion is attached as **Exhibit L** and cited as "Fingerprint Denial."

70. The Court concluded that Mr. Carruthers did not meet all four prongs of the Fingerprint Act because he failed to show that he would not have been prosecuted or convicted, or that his sentence would have been more favorable, if exculpatory results had been obtained through fingerprint testing. (Fingerprint Denial, at 14.) Specifically, the Court held that exculpatory evidence would have only shown a possible fourth participant in the crimes and that it would not have undermined the other evidence against Mr. Carruthers. *Id.*

71. In reaching this conclusion, the Court refused to consider how the fingerprint evidence would have changed Mr. Carruthers' outcome in light of other evidence not known at the time of his prosecution, conviction, and sentencing. *See id.* The Court noted that the evidence was still in existence and in a condition that would permit fingerprint testing and that Ronnie Irving's fingerprints were not previously subjected to fingerprint analysis. The Court did not evaluate whether Mr. Carruthers requested the analysis for a proper purpose. *See generally id.*

*ii.  Mr. Carruthers addressed DNA testing on initial post-conviction and in 2011.*

72.     In state post-conviction, Mr. Carruthers argued that his counsel was ineffective during pre-trial litigation for failing to retain a DNA expert, who would have testified: (1) DNA was available on blood found on "blanket-like cloth"; and (2) the DNA did not belong to the victim nor any of the three co-defendants. *Carruthers v. State*, No. W2006-00376-CCA-R3PD, 2007 WL4355481, at *33 (Tenn. Crim. App. Dec. 12, 2007).

73.     The Tennessee Court of Criminal Appeals rejected this claim, concluding that this testimony and DNA results "are only very minimally helpful to the petition. In no ways does this evidence negate all other proof in the case and it is rank speculation to assume that this indicates that a third party might have committed this crime." *Id.* at *38.  The Tennessee Court of Criminal Appeals affirmed the lower court's denial of the claim. *Id*.

74.     In 2011, Mr. Carruthers again moved *pro se* to reopen state post-conviction proceedings under the DNA Act, seeking testing of the vaginal swab and blanket from trial, using a pre-printed form. Mr. Carruthers sought testing under only the mandatory provisions of the DNA Act. Tenn. Code Ann. § 40-30-304. *Carruthers v. State*, No. W2012–01473–CCA–R3–PD, 2013 WL 3968787 at*3 (Tenn. Crim. App. Aug. 1, 2013).

75.     The State opposed the testing, arguing that while the DNA sample from the blanket did not match any of the codefendants, it had been uploaded to CODIS as of April 2012 and there were no hits. *Id* at *4.

76.     The post-conviction court dismissed Mr. Carruthers' motion, relying on the 2007 ruling in his post-conviction case that the DNA testing "has already occurred, and the results are only minimally helpful to Petitioner." *Id* at *3. The Court ruled that Mr. Carruthers did not meet

20

the statute's requirement for mandatory testing because a "new CODIS match might identify the depositor of the biological material on the blanket but could not prove that it was deposited at a time contemporaneous with the crime for which Petitioner was convicted." *Id*. at \*4.

### iii. After his execution was scheduled, Mr. Carruthers' filed another request for DNA testing.

77. In March 2026, while Mr. Carruthers' fingerprint-related appeal was pending in the Tennessee Court of Criminal Appeals, new pro bono counsel entered their appearance to represent Mr. Carruthers in his continued endeavor to have available forensic evidence tested before his May 21, 2026 execution.

78. On April 9, 2026, pursuant to the DNA Act, Mr. Carruthers, through new counsel, filed the DNA Motion. (*See generally* Ex. C.)[11]

79. In the DNA Motion, Mr. Carruthers sought the DNA testing of several pieces of evidence, which are still in existence and have never been subjected to DNA testing:

    a. fingernail scrapings from Marcellos Anderson, Frederick Tucker, and Delois Anderson;[4]

    b. the bindings of Marcellos Anderson;[5] and

    c. the bindings of Delois Anderson, which include knotted pantyhose around her hand and the red socks knotted around her neck.

---

[11] The DNA Motion was filed in the Tennessee Supreme Court because it could "potentially affect" the timing of the scheduled execution. *See* Rule 12.4(E) (mandating that once an execution date is set, if a proposed motion will potentially affect the timing of an execution, a defendant must file that motion in the Tennessee Supreme Court).

80.     Mr. Carruthers' DNA Motion alleged that new advances in DNA testing and analysis create a likelihood that testing will provide investigative leads to answers far beyond the unanswered question of whose blood was on the blanket. (Keel Aff., at 2.)

81.     Mr. Carruthers provided a declaration from Criminalist and DNA expert Alan Keel, who concluded that it was likely that each of these items, the fingernails and the materials used as bindings "bear transfer biology from whomever bound the victims." (Keel Aff., at 6). Mr. Keel has conducted DNA testing in hundreds of cases in over 36 states and has reviewed the prior testing in this case of the Tennessee Bureau of Investigation and Bode Technology Group and their supporting records. (Keel Aff., at 1-2.)

82.     Because of revolutionary advances in forensic DNA testing, analysis today can lead to highly discriminating DNA profiles from common sources across different items of evidence, including sources not previously considered suitable for testing. (Keel Aff., at 2.)

83.     Mr. Keel concluded that the bindings should be sampled for transfer or touch biology from the assailant in light of current technology. (Keel Aff., at 6.) He explained:

> This approach could also produce a DNA profile or profiles common to more than one item and common to more than one victim, and/or be redundant to the blood stain profile from the #16 blanket. Such a finding would produce additional investigative leads (e.g. CODIS/GG), or minimally, support the relevance of the foreign blood previously discovered on the #16 blanket as originating from an assailant.

*Id.* In other words, the analysis could create a lead to the true perpetrator's profile. Additionally, if the male DNA profile on the bindings matched the unidentified profile from the blood on the blanket, it would support the inference that the blood was deposited at the time of the murders.

84.     Mr. Keel also explained the importance of testing the fingernail scrapings:

> Fingernails have long been recognized as likely bearing assailant biology in cases with violent/intimate contact, and with today's technology are now routinely tested. It is likely that one or more of the victims struggled with the perpetrator(s) during

22

the assault. I have personally examined fingernail evidence in over 50 cases. My experience attests and the scientific literature documents that most people sampled at random do not have foreign biology under their fingernails, and that foreign biology intentionally introduced to the fingernails of living subjects in controlled studies is short lived. Hence, foreign biology associated with the fingernails of homicide victims is usually relevant to the crime. Biology transferred from a person to another person's fingernails is rarely self-evident and often is not from blood. Any available fingernail evidence specimens from any or all of the victims should be tested in a contemporary investigation.

(Keel Aff., at 7.)

85. Assuming a profile is obtained from any or all of those items, Mr. Carruthers sought to compare that profile to the victims for exclusionary purposes, to himself, to co-defendant James Montgomery, to Ronnie Irving, and to upload any unmatched profile to CODIS. (DNA Motion, at 22.)

86. Mr. Carruthers sought to have that unknown male profile that was found on a white blanket in the grave with the victims re-run in CODIS and compared to Ronnie Irving, who James Montgomery identified as the one responsible for the kidnaping of Delois Anderson. *Id.* As noted above, this profile had already been compared to Mr. Carruthers, co-defendant James Montgomery, and the victims and uploaded to CODIS. (DNA App'x, Ex. 7.) Mr. Carruthers' counsel was provided an update in 2019 that there been no hits.

87. In the several years since then, Mr. Carruthers' counsel has not been provided with any update.

88. As of the filing of this Complaint, the DNA Motion remains pending at the Tennessee Supreme Court. *See supra* note 1.

89. While the DNA Motion has been pending in the Tennessee Supreme Court, federal investigators interviewed jurors who served on the jury at Mr. Carruthers' trial. A copy of the Declaration of David Adams is attached as **Exhibit M**. Mr. Adams concluded that "[a] DNA match

23

with a different person would make me doubt Mr. Carruthers' guilt." That same juror also stated that if she had "known that Shaw was a paid informant, I would not have voted for a death sentence." (Adams Decl., Ex. L, ¶¶ 8, 11.)

90. In addition, a separate juror acknowledged the importance of the State's argument that the victims were buried alive, stating, "I recently learned that the victims were not buried alive . . . . Had I known the victims were not buried alive, I would not have voted for a death sentence." A copy of the Declaration of Zillah Ferrari is attached as **Exhibit N**.

**CLAIMS FOR RELIEF**

91. Mr. Carruthers re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 - 90 above.

## I. First Claim for Relief: Denial of Due Process (Fingerprint Act)

92. The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee the right to due process. *See* U.S. Const. amend. V, XIV.

93. Mr. Carruthers has a liberty interest in utilizing state procedures to demonstrate his innocence and/or seek a reduction of his sentence. *See, e.g, Gutierrez v. Saenz*, 606 U.S. 305, 314 (2025). The State of Tennessee has created a statutory procedure through which convicted persons can obtain post-conviction DNA and fingerprint testing—and then utilize exculpatory results from that testing to secure relief from their convictions, including post-conviction relief, a new trial, or executive clemency. Tenn. Code Ann. § 40-30-404, § 40-30-405 (Fingerprint Act provisions); Tenn. Code Ann. § 40-30-117 (Reopen Post-Conviction Proceedings); Tenn. Code Ann. § 40-27-101(Governor's Clemency Authority). These processes, established by the State, for obtaining access to DNA and fingerprint testing must comport with fundamental fairness and due process. *See Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009); *see also Skinner*, 562 U.S. at 530 (permitting a due process claim under 42 U.S.C. § 1983 where a state official

24

refuses to release biological evidence for testing, thereby depriving a prisoner of "his liberty interests in utilizing state procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of his sentence"); *Pichiorri v. Burghes*, 162 F.4th 745, 753 (6th Cir. 2025) (recognizing that state law can give rise to a liberty interest for a prisoner in obtaining DNA evidence).

94.     Tennessee's application of the postconviction relief procedure for fingerprint analysis "is fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. 52 at 69.

95.     As stated above, the Fingerprint Act directs that fingerprint analysis *shall* be granted if the movant establishes all four prongs in the mandatory statutory provision, after notice to the prosecution and opportunity to respond. Tenn. Code Ann. § 40-30-404.

96.     Further, the court *may* grant fingerprint analysis if the defendant satisfies the four prongs set out in Tenn. Code Ann. § 40-30-405. The requirements for discretionary testing are substantially similar to the mandatory provision, except that prong one is less stringent: "A reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." Tenn. Code Ann. § 40-30-405.

97.     Because of the similarity in the statutory language between the more recently enacted Fingerprint Analysis Act of 2021 and the Post-Conviction DNA Analysis Act, "Tennessee courts may look to jurisprudence governing the Post-Conviction DNA Analysis Act for guidance in dealing with cases involving the Post-Conviction Fingerprint Analysis Act." *Brown v. State*, No. W2024-01291-CCA-R3-ECN, 2025 WL 1514669, at *5 (Tenn. Crim. App. May 28, 2025);

25

*see also Smith v. State*, No. M2021-01339-CCA-R3-PD, 2022 WL 854438 (Tenn. Crim. App. Mar. 23, 2022).

98.     The State's interpretation and application of its Fingerprint Act is unconstitutional because it violates fundamental fairness and impermissibly deprives Mr. Carruthers of access to fingerprint analysis by imposing a nearly impossible standard for mandatory testing, ignoring the lower standard required for permissive testing and imposing an arbitrary and indefensible time restriction on new evidence.

### A.      *The Tennessee court's interpretation of the Fingerprint Act imposes a near impossible burden that violates Mr. Carruthers' right to due process.*

99.     The Tennessee courts violated Mr. Carruthers' due process rights by interpreting the Fingerprint Analysis Act to require a standard far more demanding than the already challenging "reasonable probability" standard required by the Fingerprint Act.

100.    In evaluating prong one, the postconviction court held that "even if there had been proof that Mr. Irving was involved, that fact would not have eliminated the possibility that [the Petitioner] was involved." (Fingerprint Denial, at 13.) The appellate court reiterated this on appeal, writing: "The evidence in the record supports the trial court's conclusion that the Petitioner failed to show that the Petitioner *would not have been prosecuted or convicted* if exculpatory results had been obtained through fingerprint analysis or that he *would have gotten* more favorable results if the results had been available before trial and sentencing." (Fingerprint Denial, at 14 (emphasis added).) This is not the standard.

101.    The mandatory provision of the Fingerprint Act requires only a showing that "a *reasonable probability* exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis." Tenn. Code Ann. § 40-30-

404(1) (emphasis added). Similarly, the permissive provision requires only that "a *reasonable probability* exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence *more favorable*." Tenn. Code Ann. § 40-30-405(1) (emphasis added). Neither provision requires the petitioner to show that fingerprint results would conclusively "eliminate the possibility" of his involvement.

102.    A reasonable probability is a probability sufficient to undermine confidence in the outcome—it does not demand certainty, nor does it require that the evidence foreclose all other possibilities. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

103.    By asking whether the fingerprint results would "eliminate the possibility" of Mr. Carruthers' involvement, the State courts applied what amounts to a conclusive proof-of-innocence standard—a standard that is far more stringent than even the "reasonable probability" standard mandated by the Fingerprint Act. *Gutierrez v. Saenz*, 565 F.Supp.3d 892, 908 (S.D. Tex. 2021) (characterizing the similar "reasonable probability" standard required under Texas law as "undoubtedly a complex and high standard of proof").

104.    By demanding that Mr. Carruthers demonstrate that the fingerprint evidence would eliminate the possibility of his involvement entirely, the State courts imposed an insurmountable burden that the Legislature did not intend and that no petitioner could realistically satisfy.

105.    In fact, the State court's opinion suggests that Mr. Carruthers *did* meet the statutory standard—had it been applied correctly. The appellate court found: "At best, any alleged exculpatory information would have led to a possible fourth participant in these crimes." Fingerprint Denial, at 14. Certainly, another participant's involvement in the crimes—*especially* when considered with the other information we now know about Mr. Montgomery disavowing Mr. Carruthers' involvement in the crime and Mr. Shaw's recantation of his testimony inculpating

27

Mr. Carruthers, would have affected the decisions to prosecute Mr. Carruthers, convict him, and sentence him to death. *Gutierrez v. Saenz*, 606 U.S. 305, 313, 145 S. Ct. 2258, 2264–65, 222 L. Ed. 2d 531 (2025).

106. The state courts' misapplication of the statutory standard deprived Mr. Carruthers of his liberty interest in utilizing state procedures to demonstrate his innocence in violation of the Due Process Clause of the Fourteenth Amendment.

> **B.** **The State courts applied an improper temporal limitation in considering Mr. Carruthers' request for testing under the Fingerprint Act that resulted in a denial of due process.**

107. In denying Mr. Carruthers' request under the Fingerprint Act, the State courts violated fundamental fairness by improperly imposing a temporal limitation on the evidence to be considered and refusing to consider new evidence.

108. In denying Mr. Carruthers' request, the postconviction court held that identifying the fingerprints as Mr. Irving's would not have resulted in a reasonable probability that Mr. Carruthers would not have been prosecuted or convicted because "[t]he alleged connection of Mr. Irving to this case was not known until 2010, more than a decade after the indictment, conviction, and sentencing of [the Petitioner] in this case." Fingerprint Denial, at 13 (quoting postconviction court). On review, the appellate court affirmed this determination. *See generally* Fingerprint Denial.

109. This interpretation of the Fingerprint Act results in an absurdity, effectively evaluating the exculpatory potential of the fingerprint evidence in a vacuum by considering only what was known at the time of trial and ignoring all subsequently discovered evidence bearing on the significance of the fingerprint results. This approach offends common notions of fundamental

28

fairness. Any evidence that tends to increase the exculpatory value of the fingerprints must be considered to avoid an unfair result.

110. While the significance of Mr. Irving's fingerprints may not have been known thirty years ago, it is known now. Mr. Montgomery's statement implicating Mr. Irving in the crime increases the exculpatory value of the fingerprint results.

111. The State courts also refused to consider other evidence that has come to light since Mr. Carruthers' trial that, considered with the fingerprints, unquestionably increases the probability that Mr. Carruthers would not have been prosecuted, convicted, or sentenced to death, including:

   a. In 2024, the State finally revealed that Mr. Shaw was a paid informant, directly undermining his credibility as a witness. (DNA App'x, Exs. 25-27). This information was not known by the defense at the time of trial and was not presented at trial for the jury to review in considering Mr. Shaw's testimony.[12]

   b. New evidence has discredited the medical examiner's testimony that the victims were buried alive. In postconviction proceedings, it became clear there was no scientific basis for the State's theory that the victims were buried alive. Dr. Smith himself disavowed this conclusion. (DNA App'x, Ex. 28 (Affidavit of Dr. O.C. Smith ("I will no longer sustain an opinion, as I did in my original testimony, that to a reasonable degree of medical certainty, the victims were in fact alive at the time they were buried beneath the coffin.")); DNA App'x, Ex. 29 (Testimony of Dr. Cleland Blake and Dr. George Nichols (post-conviction

_____

[12] This alone violates Mr. Carruthers' constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

29

expert testimony that there was no scientific basis for Dr. Smith's trial testimony)).

112.     The court's insistence on evaluating the exculpatory value of the fingerprints in a vacuum—ignoring evidence and information that has come to light in the thirty years since Mr. Carruthers' trial, and then ignoring the fact that even in a vacuum the Irving evidence had exculpatory value—is contrary to both common sense and principles of fundamental fairness. In fact, the advent of technology is the entire purpose behind the Fingerprint Act.

113.     By artificially restricting the universe of facts it considered in assessing whether fingerprint results would be exculpatory, the State courts' interpretation renders the Fingerprint Analysis Act a nullity for any case in which the connection between the fingerprint evidence and an alternative suspect emerged after trial. To apply such a standard makes the process for relief under the Fingerprint Analysis Act fundamentally inadequate to provide such relief.

114.     Therefore, the State courts denied Mr. Carruthers' right to due process by depriving him of the meaningful opportunity the legislature intended to provide for in enacting the Fingerprint Act—*i.e.*, demonstrating innocence through post-conviction fingerprint analysis.

### C.     *The State courts' failure to analyze Mr. Carruthers' request under the permissive provision of the Fingerprint Act violated his right to due process.*

115.     The State courts further violated Mr. Carruthers' due process rights by failing to fully analyze and consider his petition under the permissive provision of the Fingerprint Act (Tenn. Code Ann. § 40-30-405).

116.     The permissive provision of the Fingerprint Act creates a liberty interest in the post-conviction relief process enumerated in the law. Under this provision, the court *may* order fingerprint analysis if a reasonable probability exists that the results "would have rendered the

30

petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." Tenn. Code Ann. § 40-30-405(1). This standard is deliberately less stringent than the mandatory provision, as it does not require that the petitioner would not have been convicted at all, but only that his verdict or sentence would have been "more favorable."

117.    The State courts effectively collapsed their analysis of the mandatory and permissive provisions into a single inquiry, concluding that Mr. Carruthers failed to meet all four prongs of either provision. (Fingerprint Denial, at 13.) The court merely stated that Mr. Carruthers failed to show that the fingerprint analysis would render his verdict or sentence more favorable. But the court made no independent analysis of how fingerprint results linking Mr. Irving to the crime scene would have affected Mr. Carruthers' sentence.

118.    The court's analysis focused entirely on whether the evidence would have prevented Mr. Carruthers' conviction, reasoning that even with Irving's involvement, Mr. Carruthers could still have been "involved." The court made no findings whatsoever regarding whether fingerprint evidence implicating another individual in these crimes would have rendered Mr. Carruthers' sentence—death—more favorable.

119.    This is especially significant because Tennessee recognizes residual doubt as a non-statutory mitigating factor, which this exculpatory evidence would support. *State v. Hartman*, 42 S.W.3d 44, 56 (Tenn. 2001) (citing *State v. Teague,* 897 S.W.2d 248, 256 (1995)). Surely, at least one juror would have been swayed by this exculpatory fingerprint evidence to harbor residual doubt as to Mr. Carruthers' guilt and, at the least, to refuse to join an unanimous verdict for the death penalty. Indeed, one of Mr. Carruthers' jurors recently confirmed that exculpatory DNA evidence would have has this effect. (*See* Ex. L.)

31

120.    Mr. Carruthers was sentenced to death for three counts of first-degree murder. Evidence that another individual—one specifically identified by the co-defendant as the "kidnap man"—left fingerprints at the victim's home is clearly relevant to sentencing, including the weight of aggravating circumstances and the existence of mitigating factors. Considering that Mr. Carruthers' case rested on entirely circumstantial evidence with no physical evidence linking him to the crimes, there is a reasonable probability that fingerprints inculpating another individual would have resulted in a more favorable verdict or sentence for Mr. Carruthers. (*Cf.* Ex. M.)

121.    As such, Mr. Carruthers had an interest in having the court meaningfully consider whether the requested fingerprint analysis would have rendered his verdict or sentence more favorable. The State courts' failure to meaningfully consider and engage in that analysis under the permissive provision of the Fingerprint Act deprived Mr. Carruthers' of his constitutionally protected liberty interest afforded by the Act.

### D.    *The State courts improperly dismissed the inculpatory effect of fingerprint results on third parties.*

122.    The State courts' analysis also violated Mr. Carruthers' due process rights by dismissing the significance of fingerprint evidence that would inculpate a third party. The court concluded that "[a]t best, any alleged exculpatory information would have led to a possible fourth participant in these crimes," and that "[e]ven if the analysis revealed exactly what the Petitioner asserts, it would not have undermined the significant evidence against him unrelated to those fingerprints." (Fingerprint Denial, at 14.)

123.    This reasoning ignores the most powerful aspect of fingerprint analysis: its capacity to identify the involvement of other individuals in the crime. The court's interpretation of the Fingerprint Act's requirement that the petitioner show he would not have been convicted if

32

exculpatory fingerprint results were produced ignores the most powerful aspects of forensic testing by excluding from consideration evidence tending to inculpate third parties.

124. In its analysis, the court expressly failed to consider the importance to Mr. Carruthers' case of evidence inculpating Mr. Irving, instead holding the evidence would only show "a possible fourth participant." This violates due process. *Cf. Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that the trial court's exclusion of evidence that inculpated a third party denied the defendant a trial in accord with fundamental standards of due process).

125. The discovery that Ronnie Irving's fingerprints were present in the victim's home would be profoundly significant. Co-defendant James Montgomery identified Mr. Irving to a defense investigator as the "kidnap man" involved in these crimes. Confirmation through fingerprint analysis that Mr. Irving was present at the crime scene would provide powerful corroboration of Mr. Montgomery's statement and would fundamentally alter the evidentiary landscape of Mr. Carruthers' case.

126. It would call into serious question whether Mr. Carruthers—as opposed to Irving— was the individual who participated in these crimes alongside Montgomery.

127. Even if the evidence would not entirely exonerate Mr. Carruthers, it would at least provide a "reasonable probability" that the outcome at trial would have been different—therefore substantiating Mr. Carruthers' request under the Act. In a case built entirely on circumstantial evidence and witness testimony, the identification of another individual's fingerprints at the victim's home is precisely the type of evidence that creates a reasonable probability that the outcome would have been different.

128. Therefore, the State courts' refusal to credit this evidence as potentially exculpatory deprived Mr. Carruthers of the fair and meaningful process to which he is constitutionally entitled.

**E.** ***The State courts' summary dismissal of Mr. Carruthers' request under the Fingerprint Act violated his right to due process.***

129. The state courts violated Mr. Carruthers procedural due process rights by arbitrarily denying fingerprint analysis when his petition satisfied the requirements of the Fingerprint Act on its face. If the Tennessee Supreme Court had properly interpreted and applied the Fingerprint Act, it would have found Mr. Carruthers clearly satisfies all four prongs of the Act. With respect to prong one, a reasonable probability exists that Mr. Carruthers would not have been prosecuted or convicted if exculpatory fingerprint results had been obtained. The evidence used to convict Mr. Carruthers was entirely circumstantial: the State's case rested on statements attributed to Mr. Carruthers by witnesses whose credibility was contested, testimony from co-defendants and jailhouse informants, and inferences drawn from his alleged association with the co-defendants. No physical evidence directly linked Mr. Carruthers to the crime scenes. There was no DNA, no fingerprint evidence, no weapon traced to him, and no forensic evidence tying him to either crime scene.

130. Where, as here, the case against a capital defendant rests entirely on circumstantial evidence and the testimony of witnesses with significant credibility issues, a reasonable probability plainly exists that the defendant would not have been convicted—much less sentenced to death— if fingerprint analysis had revealed that the prints in the victim's home belonged to Ronnie Irving, a man implicated in these crimes by co-defendant James Montgomery.

131. With respect to prong two, the postconviction court itself found that "there is ample evidence to show that the prints located in Mrs. Anderson's residence are still in existence and in such a condition that fingerprint analysis may be conducted" (Fingerprint Denial, at 13), basing

34

this finding on the representation that the prints were run through the AFIS system in 2022 and still exist.

132. With respect to prong three, the postconviction court found that "the fingerprints of Ronnie Irving were not previously subjected to fingerprint analysis and were not subjected to the analysis that is being requested which could resolve an issue not resolved by previous analysis." (Fingerprint Denial, at 14.)

133. With respect to prong four—which the appellate court failed to even analyze—Mr. Carruthers' petition was plainly made for the purpose of demonstrating innocence. He sought to establish that a person identified by his own co-defendant as the actual perpetrator left fingerprints at the crime scene, not to unreasonably delay the execution of sentence or administration of justice. In fact, his initial request for fingerprint testing was filed four years before his execution was scheduled.

134. Because Mr. Carruthers satisfied the statutory requirements on the face of his pleadings, the State courts' summary dismissal of his petition deprived him of his liberty interest in using state procedures to demonstrate his innocence.

135. By refusing to order fingerprint analysis, and thereby preventing Mr. Carruthers from gaining access to exculpatory evidence that could demonstrate he is not guilty of capital murder, Defendants deprived Mr. Carruthers of his liberty interests in utilizing state procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of his sentence from the extreme punishment he currently faces: execution. The state court's unreasonable interpretations of the Fingerprint Analysis Act, and the procedural deficiencies in the handling of Mr. Carruthers' petition, have prevented Mr. Carruthers from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder.

136.    Since the State of Tennessee provides a means for obtaining post-conviction fingerprint analysis, those procedures must be imbued with fundamental fairness. *See generally Osborne*, 557 U.S. 52; *Skinner*, 562 U.S. 521. Because they were not here, the State has violated Mr. Carruthers' right to due process under the Fourteenth Amendment to the U.S. Constitution.

**II.    Second Claim for Relief: Denial of Access to Courts Process (Fingerprint Act)**

137.    The First and Fourteenth Amendments guarantee litigants and criminal defendants access to courts. *See* U.S. Const. amend. I, XIV.

138.    Under this right, the State must make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies. *Bounds v. Smith*, 430 U.S. 817, 828 (1977). State law must ensure that prisoners like Mr. Carruthers have "adequate, effective, and meaningful" access to post-conviction remedies in order to vindicate this right. *Id.* (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to ensure their constitutional right of access to courts be upheld).

139.    As alleged above, Mr. Carruthers has available remedies under Tennessee law for access to post-conviction fingerprint testing, a declaration of innocence based on the exculpatory results of such testing, to relief from his conviction based on the exculpatory results of such testing, and to executive clemency based on the exculpatory results of such testing.

140.    Mr. Carruthers has incurred actual injury when the State courts denied his request for fingerprint testing.

141.    First, the Tennessee Court of Appeals' unreasonable interpretation of the Fingerprint Act has prevented Mr. Carruthers from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder and, therefore, should not be executed.

36

142. The court's assertion that the relevance of another party's fingerprints not being addressed until 2010, "more than a decade after the indictment, conviction, and sentencing" (Fingerprint Denial, at 13), exhibits an unreasonable interpretation that the statute would be applicable only to evidence known and available at the time of indictment and trial. The Act states that "any appropriate party may, *at any time*, file a petition requesting the performance of fingerprint analysis of *any evidence* that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and *that is related to the investigation or prosecution* that resulted in a judgment of conviction and that may contain fingerprint evidence" (TN Code § 40-30-403 (a) (2024)) emphasis added.

143. This statute does not state a specific deadline for filing a motion nor does it require that evidence may be tested only when the involvement of another specific actor is known at the time of the indictment or trial.

144. The court's statement that the evidence in question must have "a known connection prior to the indictment and/or trial and/or sentencing" is an unreasonable interpretation and an arbitrary application of this statute. (Fingerprint Denial, at 13.) The outcome of this interpretation is contrary to the intention of this statute to give prisoners like Mr. Carruthers access to post-conviction remedies.

145. The physical evidence connecting Mr. Carruthers' to this case is non-existent. Thus, it is imperative to Mr. Carruthers that the fingerprints found at Ms. Anderson's home be connected to the correct person and is essential to showing reasonable probability that Mr. Carruthers' involvement was not what the prosecution stated it was.

146. The fact that Mr. Carruthers' co-defendant has named another party (Mr. Irving) as being directly involved in the crimes and the fact that there are fingerprints that cannot be attributed

37

to Mr. Carruthers at the scene, would create reasonable doubt for a jury. And reasonable doubt of Mr. Carruthers' guilt supports a reasonable probability that the jury would not have convicted Mr. Carruthers of these crimes.

147.    As a result, the state court's refusal to allow the fingerprints to be tested, declining to acknowledge potentially exculpatory evidence, denies Mr. Carruthers adequate, meaningful, and effective access to the courts through the appropriate application of The Post-Conviction Fingerprint Act.

148.    Second, Mr. Carruthers has remedies for relief of his capital punishment sentence based upon exculpatory evidence that would result in a more favorable sentence per the application of the discretionary statute.  However, the court has erred by not providing a specific analysis of Mr. Carruthers' request under the discretionary statute.

149.    In its decision, the court addresses both the outcome of the mandatory portion of the statute (TN Code § 40-30-404 (2024)) and the outcome of the discretionary portion statute (TN Code § 40-30-405 (2024)) simultaneously with the analysis focused entirely on Mr. Carruthers' involvement in the case.  (Fingerprint Denial, at 13.)

150.    Addressing only Mr. Carruthers' involvement in this case limits the court's analysis to the mandatory statute's requirement to show a reasonable probability that Mr. Carruthers would not have been prosecuted or convicted.  The court does not provide additional and separate analysis on how the available and exculpatory evidence identifying the involvement of another party affects Mr. Carruthers' severe sentence. In fact, the court addresses the mandatory statute directly (Fingerprint Denial, at 12) but does not do the same type of direct analysis for the discretionary statute.

151.    Instead, it appears to conflate the analysis under the discretionary provision as identical under the mandatory provision. It does not address the reasonable probability that the proven involvement of another actor would place that party more directly at the scene, particularly because there is no physical evidence that ties Mr. Carruthers to this crime. The court simply adds on an iteration of the phrase "the verdict or sentence more favorable" to its statements that "such evidence would not have prevented the prosecution and conviction of Mr. Carruthers." (Fingerprint Denial, at 13-14), as if the mere addition of words from the discretionary statute satisfies their responsibility to provide a thorough analysis in the opinion.

152.    Failing to address specifically the reasonable probability that Mr. Carruthers' sentence would have been more favorable if the results of fingerprint testing showed evidence of another's involvement in this case frustrates his meaningful access to the remedies available by Tennessee statute.

153.    The court's omission of a specific analysis of the discretionary statue unfairly limits Mr. Carruthers' ability to seek the legal post-conviction remedies available to him under state law.

154.    These failures have deprived Mr. Carruthers of his fundamental right to access to courts under the First and Fourteenth Amendments.

### Request for Injunctive Relief: Release of Evidence for Testing

155.    For the reasons stated above, the Constitution requires declaratory relief that the denial of forensic testing to Mr. Carruthers ahead of his scheduled execution violates the Constitution and that Mr. Carruthers be afforded the opportunity to conduct forensic testing on the evidence identified in this Complaint. Further, Mr. Carruthers requests injunctive relief compelling those Defendants who are custodians of the evidence identified in this Complaint to release the evidence designated below for testing. Accordingly, Mr. Carruthers asks this Court to grant

prospective injunctive relief compelling the Defendants to release the evidence identified in this Complaint so that the requested testing can be accomplished.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tony Carruthers prays that this Court provide relief as follows:

1. A declaratory judgment that Tenn. Code Ann. §§ 40-30-404, 40-30-405, as applied by the Tennessee state courts, is unconstitutional under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution because:

   i. it impermissibly heightens the petitioner's burden under both the mandatory provision (Tenn. Code Ann. § 40-30-404) and the permissive provision (Tenn. Code Ann. § 40-30-405) by requiring a showing that fingerprint results would "eliminate the possibility" of the petitioner's involvement, rather than applying the "reasonable probability" standard set forth in the statute;

   ii. it imposes an arbitrary temporal limitation by refusing to consider evidence developed after trial, including the post-trial identification of an alternate suspect, the State's belated disclosure of paid-informant status, and the discrediting of medical examiner testimony, in evaluating the exculpatory potential of fingerprint testing;

   iii. it fails to meaningfully analyze petitions under the permissive provision of Tenn. Code Ann. § 40-30-405, which requires only a reasonable probability that the results would have rendered the petitioner's verdict or sentence more favorable, including with respect to a sentence of death;

   iv. it discounts the significance of fingerprint evidence that would inculpate third parties at the crime scene;

40

v.      it permits summary dismissal of petitions that satisfy the statutory requirements on their face; and

vi.     it deprives petitioners of constitutionally protected liberty interests in utilizing state procedures to demonstrate innocence, obtain reversal of convictions or reduction of sentences, obtain executive clemency, and enjoy adequate, effective, and meaningful access to the courts;

2.      A preliminary and permanent injunction requiring Defendants to produce and release for testing the six latent partial palm impressions of value from Ms. Anderson's house, compare them with the known standards of Ronnie Irving, and submit them to AFIS database, pursuant to an appropriate protocol regarding chain of custody and preservation and return of such evidence after testing has been completed;

3.      A preliminary and permanent injunction prohibiting Defendants from executing Mr. Carruthers until the testing in paragraph 2 above is completed and the State can do so in a way that does not violate his rights;

4.      Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

5.      All other relief the Court deems appropriate and necessary.

Dated: April 28, 2026

Respectfully submitted,

/s/ *Lucas Cameron-Vaughn*
Lucas Cameron-Vaughn, Esq.
TN BPR No. 036284
ACLU of Tennessee
P.O. Box 120160
Nashville, Tennessee 37212
(615) 645-5067
lucas@aclu-tn.org

QUARLES & BRADY LLP

Melanie C. Verdecia, Esq.*
101 East Kennedy Blvd., Suite 3400
Tampa, FL 33602
(813) 387-0279
melanie.verdecia@quarles.com

Maria DeLiberato, Esq.*
American Civil Liberties Union
201 W. Main St. Suite 402
Durham, NC 27701
(717) 503-2730
mdeliberato@aclu.org

*Pro Hac Vice* Forthcoming

*Counsel for Plaintiff Tony Carruthers*

42