IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TONY VON CARRUTHERS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:26-cv-00540 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| JONATHAN SKRMETTI, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## **<u>MEMORANDUM OPINION</u>**

Plaintiff, Tony Von Carruthers, is scheduled to be executed on May 21, 2026. The amended (and operative) complaint in this action (Doc. No. 32, "Amended Complaint") seeks injunctive and declaratory relief, including a preliminary injunction and a permanent injunction barring Defendants from executing Plaintiff at least until certain fingerprint analysis has been conducted under the Post-Conviction Fingerprint Analysis Act of 2021 ("Fingerprint Act"), Tenn. Code Ann. §§ 40-30-401 *et seq*., and certain DNA analysis has been conducted under the Post-Conviction DNA Analysis Act of 2001 ("DNA Act"), Tenn. Code Ann. §§ 40-30-301 *et seq*.

Now pending before the Court is Plaintiff's "Emergency Motion for Preliminary Injunction and Stay of Execution" (Doc. No. 3, "First Motion"). Via the First Motion, Plaintiff seeks an order "(1) granting [the] [First M]otion, (2) staying [Plaintiff's] execution currently scheduled for May 21, 2026, pending resolution of his [Amended] Complaint [p]ursuant to 42 U.S.C. § 1983, (3) entering a preliminary injunction enjoining Defendants from executing [Plaintiff] until this litigation is resolved, and (4) granting all other relief the Court deems appropriate." (Doc. No. 3 at 8). Defendants Jonathan Skrmetti, Steve Mulroy, David Rausch, Frank Strada, and Kenneth Nelson (collectively, "State Defendants") have filed a response (Doc. No. 24) in opposition to the

First Motion.[1] Plaintiff has filed a reply (Doc. No. 33) in further support of the First Motion.

Plaintiff has also filed an "Emergency Motion to Stay Litigation and Second Emergency Motion for Stay of Execution" (Doc. No. 22, "Second Motion," and collectively with the First Motion, "Motions"), therein seeking an order "(1) granting [the] [Second M]otion, (2) staying this litigation pending resolution of his pending request for DNA testing in the [Tennessee state courts], (3) staying his execution currently scheduled for May 21, 2026, pending resolution of this litigation, and (4) granting all other relief the Court deems appropriate." (Doc. No. 22 at 5).[2] The State Defendants have filed a response (Doc. No. 26) in opposition to the Second Motion. Plaintiff has filed a reply (Doc. No. 35) in further support of the Second Motion.

For the reasons stated herein, the First Motion and the Second Motion will be **DENIED** in their entirety.

---

[1] Plaintiff has sued not only the State Defendants, but also Cerelyn Davis, Scott Collier, and Heidi Kuhn. The Court herein will refer to Cerelyn Davis, Scott Collier, Heidi Kuhn, and the State Defendants collectively as "Defendants."

Heidi Kuhn has filed a response to the First Motion, indicating that "she takes no position on [the First Motion]." (Doc. No. 20 at 2). Scott Collier has also filed a response to the First Motion, indicating that he "takes no position on [the First Motion]." (Doc. No. 25 at 2). Cerelyn Davis has not filed a response to the First Motion.

The Court notes that Plaintiff does next to nothing to explain who all is being sued on which claim or why any particular Defendant is on the hook for relief in connection with any claim. This alone might be grounds to find a likelihood of lack of success on the merits, but the Court will forgo invoking such grounds.

[2] Heidi Kuhn has filed a response (Doc. No. 27) to the Second Motion therein contending that she "takes no position on [the Second Motion]." (Doc. No. 27 at 2). Scott Collier has also filed a response to the Second Motion, stating therein that he "takes no position on [the Second Motion]." (Doc. No. 34 at 2). Cerelyn Davis has not filed a response to the Second Motion

BACKGROUND[3]

This action arises from Plaintiff's efforts to obtain post-conviction fingerprint analysis under the Fingerprint Act and DNA analysis under the DNA Act. (Doc. No. 32). Below, the Court first will review the factual background of this action, including the circumstances underlying Plaintiff's conviction, Plaintiff's various efforts to attain post-conviction relief, and Plaintiff's efforts specifically to obtain post-conviction fingerprint analysis and DNA analysis. The Court then will examine the statutory framework for post-conviction fingerprint analysis pursuant to the Fingerprint Act and for post-conviction DNA analysis pursuant to the DNA Act. The Court then will examine the claims in the Amended Complaint and examine the Motions and the briefing thereon.

1. Factual Background

    a. *Underlying Criminal Case*

The Tennessee Supreme Court, when considering Plaintiff's conviction on appeal, summarized the circumstances underlying that conviction. The Court will repeat that summation from the Tennessee Supreme Court, largely verbatim, immediately below:[4]

> The defendants, Tony V. Carruthers and James Montgomery, were each convicted of first degree murder for killing Marcellos "Cello" Anderson, his mother Delois Anderson, and Frederick Tucker in Memphis in February of 1994. All of the victims disappeared on the night of February 24, 1994. On March 3, 1994, their bodies were found buried together in a pit that had been dug beneath a casket in a

---

[3] When citing a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Amended Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

[4] The Court need not and does not accept as accurate this summation by the Tennessee Supreme Court. The Court provides this summation merely as context for its discussion herein. As will become clear below, the constitutional proprietary (or alleged lack thereof) in Plaintiff's state court criminal proceedings is not at issue in this action, because the instant action concerns an injury rooted in Plaintiff's *post-conviction* proceedings and not an injury rooted in the criminal proceedings leading to Plaintiff's conviction.

grave in a Memphis cemetery.

***

The proof introduced at the guilt phase of the trial showed that one of the victims, Marcellos Anderson, was heavily involved in the drug trade, along with two other men, Andre "Baby Brother" Johnson and Terrell Adair. Anderson wore expensive jewelry, including a large diamond ring, carried large sums of money on his person, and kept a considerable amount of cash in the attic of the home of his mother, victim Delois Anderson. When his body was discovered, Anderson was not wearing any jewelry and did not have any cash on his person. Anderson was acquainted with both defendants, and he considered Carruthers to be a trustworthy friend. The proof showed that Anderson's trust was misplaced.

In the summer of 1993 Jimmy Lee Maze, Jr., a convicted felon, received two letters from Carruthers, who was then in prison on an unrelated conviction. In the letters, Carruthers referred to "a master plan" that was "a winner." Carruthers wrote of his intention to "make those streets pay me" and announced, "everything I do from now on will be well organized and extremely violent." Later, in the fall of 1993, while incarcerated at the Mark Luttrell Reception Center in Memphis awaiting his release, Carruthers was assigned to a work detail at a local cemetery, the West Tennessee Veterans' Cemetery. At one point, as he helped bury a body, Carruthers remarked to fellow inmate Charles Ray Smith "that would be a good way, you know, to bury somebody, if you're going to kill them.... [I]f you ain't got no body, you don't have a case."

Smith also testified that he overheard Carruthers and Montgomery, who also was incarcerated at the Reception Center, talking about Marcellos Anderson after Anderson had driven Carruthers back to the Reception Center from a furlough. According to Smith, when Montgomery asked Carruthers about Anderson, Carruthers told him that both Anderson and "Baby Brother" Johnson dealt drugs and had a lot of money. Carruthers said he and Montgomery could "rob" and "get" Anderson and Johnson once they were released from prison.

When Carruthers was released from the Department of Correction on November 15, 1993, he left the Reception Center with Anderson. Carruthers accompanied Anderson to Andre Johnson's house, and received a gift of $200 cash from Anderson, Johnson, and Terrell Adair, who was present at Johnson's house.

One month later, on December 15, 1993, Smith was released from the Department of Correction. Upon his release, Smith warned Anderson and Johnson of Carruthers' and Montgomery's plans to "get them." According to Smith and Johnson, Anderson did not take the warning or the defendants' threats seriously.

In mid-December 1993, Maze, his brother and Carruthers were riding around Memphis together. They came upon Terrell Adair's red Jeep on the street in front of Delois Anderson's home where a drive-by shooting had just occurred. Adair had

been injured in the shooting and was in the hospital. Jonathan "Lulu" Montgomery, James Montgomery's brother, was at the scene of the shooting, and he joined Carruthers in the back seat of Maze's car. According to Maze, Carruthers remarked to Jonathan that, "it would be the best time to kidnap Marcellos," and Jonathan asked, "which one Baby Brother or Marcellos?" Carruthers then nudged Montgomery with his elbow and said "it" was going to take place after James Montgomery was released from prison. About two weeks later, on December 31, Maze saw Carruthers loading three antifreeze containers into a car, and Carruthers indicated to Maze that the containers were filled with gasoline.

On January 11, 1994, James Montgomery was released from prison. After his release, Montgomery told "Baby Brother" Johnson that he, not Johnson, was in charge of the neighborhood. Montgomery said, "It was my neighborhood before I left, and now I'm back and its my neighborhood again." Montgomery asked Johnson if he wanted to "go to war about this neighborhood." When Johnson said, "no," Montgomery replied "You feeling now like I'm about to blow your motherf–––g brains out" and "you all need to get in line around here or we're going to war about this." Near the end of January or the first of February 1994, Johnson and Adair saw the defendants sitting together in an older model grey car down the street from Johnson's mother's home. It was late at night, between 11 p.m. and 1 a.m. When the defendants approached Johnson and Adair, Montgomery asked why they thought he was trying to harm them. Montgomery told them, "Look, I told you, we ain't got no problem with nobody in this neighborhood. We already got our man staked out. If we wanted some trouble or something, we got you right now. We'd kill your whole family." Confirming Montgomery's statement, Carruthers told them, "We already got our man staked out. You all right. If it's any problem, we'll deal with it later." Montgomery explained that he intended to take the "man's" money and drugs, and said, "if the police didn't have no body, they wouldn't have no case."

On February 23, 1994, Marcellos Anderson borrowed a white Jeep Cherokee from his cousin, Michael Harris. Around 4:30 on the afternoon of February 24, 1994, witnesses saw Marcellos Anderson and Frederick Tucker riding in the Jeep Cherokee along with James and Jonathan Montgomery. About 5 p.m. that day, James and Jonathan Montgomery and Anderson and Tucker arrived in the Jeep Cherokee at the house of Nakeita Shaw, the Montgomery brothers' cousin. Nakeita Shaw, her four children, and Benton West, also her cousin, were present at the house when they arrived.

The four men entered the house and went downstairs to the basement. A short time later, James Montgomery came back upstairs and asked Nakeita Shaw if she could leave for a while so he could "take care of some business." Nakeita Shaw told West that she thought "they" were being kidnapped, and then she left the house with West and her children. West agreed to care for Nakeita Shaw's children while she attended a meeting.

When Nakeita Shaw returned home after the meeting, she saw only Carruthers and James Montgomery. Montgomery asked her to go pick up her children and to "stay gone a little longer." Nakeita Shaw returned home with her children before 10 p.m. The Jeep Cherokee was gone, but James Montgomery and Carruthers were still present at her home. Montgomery told Nakeita Shaw to put her children to bed upstairs and remain there until he told her he was leaving. Sometime later, Montgomery called out to Nakeita Shaw that he was leaving. She returned downstairs and saw James Montgomery, Carruthers, and the two victims, Anderson and Tucker, leave in the Jeep Cherokee. Prior to trial, Nakeita Shaw told the police that Anderson's and Tucker's hands were tied behind their backs when they left her house. While she admitted making this statement, she testified at trial that the statement was false and that she had not seen Anderson's and Tucker's hands tied when they left her home.

In the meantime, around 8 p.m. on February 24, Laventhia Briggs telephoned her aunt, victim Delois Anderson. When someone picked up the telephone but said nothing, Briggs hung up. Briggs called "a couple of more times" but received no answer. Briggs was living with Delois Anderson at the time and arrived at her aunt's home around 9:00 p.m. Although Delois Anderson was not home, her purse, car, and keys were there. Food left in Anderson's bedroom indicated that she had been interrupted while eating. Briggs went to bed, assuming her aunt would return home soon. A co-worker, whom Delois Anderson had driven home around 7:15 p.m., was the last person to have seen her alive.

Chris Hines, who had known the defendants since junior high school, testified that around 8:45 p.m. on February 24, 1994, Jonathan Montgomery "beeped" him. Jonathan said, "Man, an——r got them folks." When Hines asked, "What folks?" Jonathan replied, "Cello and them" and said something about stealing $200,000. Jonathan then indicated that he could not talk more on the telephone and arranged to meet Hines in person. Jonathan arrived at Hines' home at about 9:00 p.m. and told him, "Man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000. Man, a n——r had to kill them folks." At that point, James Montgomery "beeped in" and talked with Jonathan. When the telephone call ended, Jonathan asked Hines to drive him to the cemetery. Hines refused, but he allowed Jonathan to borrow his car, which Jonathan promised to return in an hour. When the car was not returned, Hines called James Montgomery's cellular telephone at around 11 p.m. James told Hines that he did not know where Jonathan was, that Jonathan did not have a driver's license, and that the car should be returned by 4 a.m. because Jonathan was supposed to drive James to his girlfriend's house.

The Jeep Cherokee that Anderson had borrowed was found in Mississippi on February 25 around 2:40 a.m. It had been destroyed by fire. About 3:30 a.m., after he was informed of the vehicle fire by law enforcement officials, Harris telephoned Delois Anderson's home, and Laventhia Briggs then discovered that neither her aunt Delois nor her cousin Marcellos had returned home. Briggs filed a missing person report with the police later that day.

The Montgomery brothers and Carruthers did not return Hines' car until approximately 8:30 a.m. on February 25. The car was very muddy. Hines drove James Montgomery and Carruthers to Montgomery's mother's home and then drove away with Jonathan Montgomery. That morning Jonathan, whom Hines described as acting "paranoid" and "nervous," repeatedly told Hines that "they had to kill some people." About two hours later, James Montgomery and Carruthers came to Hines' home looking for Jonathan. Hines advised Carruthers and James Montgomery that he was celebrating his birthday, and he asked James Montgomery to give him a birthday present. James agreed to give Hines twenty dollars after he picked up his paycheck, and James also agreed to have Hines' car washed immediately as a birthday present.

Hines, the Montgomery brothers, and Carruthers drove to a carwash, and James Montgomery paid an unidentified elderly man to clean the car. The man cleaned the interior of the car and the trunk of the car. Neither Carruthers nor James Montgomery supervised the cleaning of the car. After Jonathan Montgomery abruptly left the carwash, Carruthers and James Montgomery asked Hines what Jonathan had told him, but Hines did not tell them. Several days later James Montgomery came to Hines' home and offered Hines an AK–47 assault rifle because Montgomery said he had "heard that Hines was into it with some people on the street." James Montgomery told Hines the rifle had "blood on it." Hines testified that he interpreted this statement to mean that someone had been shot with the weapon.

On March 3, 1994, about one week after a missing person report was filed on Delois and Marcellos Anderson, Jonathan Montgomery directed Detective Jack Ruby of the Memphis Police Department to the grave of Dorothy Daniels at the Rose Hill Cemetery on Elvis Presley Boulevard. Daniels' grave was located six plots away from the grave site of the Montgomery brothers' cousin. Daniels had been buried on February 25, 1994. Pursuant to a court order, Daniels' casket was disinterred, and the authorities discovered the bodies of the three victims buried beneath the casket under several inches of dirt and a single piece of plywood.

An employee of the cemetery testified that a pressed wood box or vault had been placed in Daniels' grave during working hours on February 24 and that it would have taken at least two people to remove the box. Daniels' casket had been placed in the grave inside the box on February 25, and, according to Dr. Hugh Edward Berryman, one of the forensic anthropologists who assisted in the removal of the bodies from the crime scene, there was no evidence to suggest that Daniels' casket had been disturbed after she was buried. Thus, it can be inferred that the bodies of the three victims were placed in the grave and covered with dirt and a piece of plywood prior to the casket being placed in the grave.

Dr. O.C. Smith, who helped remove the bodies from the grave and who performed autopsies on the victims, testified that, when found, the body of Delois Anderson

was lying at the bottom of the grave and the bodies of the two male victims were lying on top of her. The hands of all three victims were bound behind their backs. Frederick Tucker's feet were also bound and his neck showed signs of bruising caused by a ligature. A red sock was found around Delois Anderson's neck. Marcellos Anderson was not wearing any jewelry. Dr. Smith testified that Delois Anderson died from asphyxia caused by several factors: the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body. Frederick Tucker had received a gunshot wound to his chest, which would not have been fatal had he received medical care. He had also suffered injuries from blunt trauma to his abdomen and head resulting in broken ribs, a fractured skull, and a ruptured liver. Dr. Smith opined that Tucker was shot and placed in the grave, where the force of compression from being buried produced the other injuries and, along with the gunshot wound, caused his death. According to Dr. Smith, Marcellos Anderson had been shot three times: a contact wound to his forehead that was not severe and two shots to his neck, one of which was also not serious. However, the gunshot causing the other neck wound had entered Anderson's windpipe and severed his spinal cord, paralyzing him from the neck down. This wound was not instantaneously fatal. Anderson had also suffered blunt trauma to his abdomen from compression forces. Dr. Smith opined that each victim was alive when buried.

Defendant James Montgomery presented no proof. Carruthers, acting pro se, called several witnesses to rebut the testimony offered by the State, primarily by attacking the credibility of the State's witnesses.

A health administrator at the Mark Luttrell Reception Center testified that, because of an injury to his arm, Carruthers had been given a job change on October 6, 1993, and had not worked at the cemetery after that date. Another official at the Reception Center testified that Carruthers was not released on furlough after Montgomery arrived at the Reception Center on November 4, 1994. This proof was offered to impeach Smith's testimony that Montgomery and Carruthers discussed robbing and getting Marcellos Anderson after Anderson drove Carruthers back to the Reception Center following a furlough. An investigator appointed to assist Carruthers with his defense testified that he had interviewed Maze, who admitted he did not know anything about the "master plan" to which Carruthers referred in the letters until Carruthers was released from prison. On cross-examination, the investigator admitted that Maze said that when he was released from prison, Carruthers had explained that the master plan involved kidnapping Marcellos Anderson. Carruthers' brother and another witness testified that Jonathan Montgomery was not at the scene of the drive-by shooting involving Terrell Adair. This proof was offered to impeach Maze's testimony that Carruthers and Jonathan Montgomery discussed kidnapping Marcellos on the day that Terrell Adair was shot. Another witness, Aldolpho Antonio James testified that he and Carruthers had been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for Carruthers for the early morning hours of February 25,

1994. However, on cross-examination, James admitted that he did not know the exact date he and Carruthers had been together.

Carruthers also called Alfredo Shaw as a witness. After seeing a television news report about these killings in March of 1994, Alfredo Shaw had telephoned CrimeStoppers and given a statement to the police implicating Carruthers. Alfredo Shaw later testified before the grand jury which eventually returned the indictments against Carruthers and Montgomery. Prior to trial, however, several press reports indicated that Alfredo Shaw had recanted his grand jury testimony, professed that the statement had been fabricated, and intended to formally recant his grand jury testimony when called as a witness for the defense. Therefore, when Carruthers called Alfredo Shaw to testify, the prosecution announced that if he took the stand and recanted his prior sworn testimony, he would be charged with and prosecuted for two counts of aggravated perjury. In light of the prosecution's announcement, the trial court summoned Alfredo Shaw's attorney and allowed Alfredo Shaw to confer privately with him. Following that private conference, Alfredo Shaw's attorney advised the trial court, defense counsel, including Carruthers, and the prosecution, that Alfredo Shaw intended to testify consistently with his prior statements and grand jury testimony and that any inconsistent statements Alfredo Shaw had made to the press were motivated by his fear of Carruthers and by threats he had received from him.

Despite this information, Carruthers called Alfredo Shaw as a witness and as his attorney advised, Shaw provided testimony consistent with his initial statement to the police and his grand jury testimony. Specifically, Alfredo Shaw testified that he had been on a three-way call with Carruthers and either Terry or Jerry Durham, and during this call, Carruthers had asked him to participate in these murders, saying he had a "sweet plan" and that they would each earn $100,000 and a kilogram of cocaine. Following his arrest for these murders, Carruthers was incarcerated in the Shelby County Jail along with Alfredo Shaw, who was incarcerated on unrelated charges. Carruthers and Alfredo Shaw were in the law library when Carruthers told Alfredo Shaw that he and some other unidentified individuals went to Delois Anderson's house looking for Marcellos Anderson and his money. Marcellos was not there when they arrived, but Carruthers told Delois Anderson to call her son and tell him to come home, "it's something important." When Anderson arrived, the defendants forced Anderson, Tucker, who was with Anderson, and Delois Anderson into the jeep at gunpoint and drove them to Mississippi, where the defendants shot Marcellos Anderson and Tucker and burned the jeep. According to Alfredo Shaw, the defendants then drove all three victims back to Memphis in a stolen vehicle. Alfredo Shaw testified that, after they put Marcellos Anderson and Tucker into the grave, Delois Anderson started screaming and one of the defendants told her to "shut up" or she would die like her son and pushed her into the grave. Carruthers also told Alfredo Shaw that the bodies would never have been discovered if "the boy wouldn't have went and told them folks." Carruthers told Alfredo Shaw that he was not going to hire an attorney or post bond because the prosecution would then learn that the murders had been a "hit." Carruthers told

Alfredo Shaw that Johnson also was supposed to have been "hit" and that Terry and Jerry Durham were the "main people behind having these individuals killed." Carruthers said that the Durhams wanted revenge because Anderson and Johnson had previously stolen from them.

In response to questioning by Carruthers, Alfredo Shaw acknowledged that he had told the press that his statement to police and his grand jury testimony had been fabricated, but said he had done so because Carruthers had threatened him and his family. According to Alfredo Shaw, one of Carruthers' investigators had arranged for a news reporter to speak with him about recanting his grand jury testimony.

As impeachment of his own witness, Carruthers called both Jerry and Terry Durham, twin brothers, as witnesses. The Durhams denied knowing Alfredo Shaw and said they had never been party to a three-way telephone call involving Alfredo Shaw and Carruthers. Carruthers also called attorney AC Wharton who testified that he was initially retained by Carruthers' mother to represent her son on these murder charges, but was required to withdraw because of a conflict of interest. This testimony was offered to impeach Alfredo Shaw's statement that Carruthers had said he was not going to hire an attorney or post bond. Finally, Carruthers called an administrative assistant from the Shelby County jail who testified that jail records, indicated that Alfredo Shaw was not in the law library at the same time as Carruthers in either February or March of 1994. According to jail records, Alfredo Shaw was in protective custody for much of that time and, as a result, would have been escorted at all times by a guard. However, on cross-examination, this witness *admitted that the jail records regarding the law library were not always complete or accurate and that Alfredo Shaw had been housed outside of protective custody from mid-March to early April 1994 which would have afforded him the opportunity to interact with Carruthers. The record reflects that Alfredo Shaw came forward and provided a statement to police on March 27, 1994 and that the indictments were returned on March 29, 1994.

Based upon this proof, the jury found each defendant guilty beyond a reasonable doubt of three counts of first degree murder, three counts of especially aggravated kidnapping, and one count of especially aggravated robbery.

* * *

[T]he jury imposed the death sentence as to each defendant for each of the three murder convictions.

*State v. Carruthers*, 35 S.W.3d 516, 524-30, 532 (Tenn. 2000).[5]

---

[5] Notably, Plaintiff devotes significant amount of space in his Amended Complaint to allegations concerning (alleged) constitutional deficiencies in his criminal trial (and resulting conviction) in 1996. The Court herein does not pay much heed to these (alleged) deficiencies, because the Court finds that any alleged deficiencies with respect to Plaintiff's trial are immaterial—or at least are not directly relevant—to Plaintiff's claims in the instant action, arising as they do out of Plaintiff's efforts to obtain post-conviction forensic analysis.

### b. *Post-Conviction Proceedings*

After his conviction, Plaintiff pursued—unsuccessfully—post-conviction, state habeas, and federal habeas relief. *See Carruthers v. State*, No. W2006-00376-CCA-R3-PD, 2007 WL 4355481, at *1 (Tenn. Crim. App. Dec. 12, 2007) (affirming trial court's denial of post-conviction relief); *Carruthers v. Worthington*, No. E2007-01478-CCA-R3-HC, 2008 WL 2242534, at *1 (Tenn. Crim. App. June 2, 2008) (affirming trial court's denial of state habeas relief); *Carruthers v. Mays*, 889 F.3d 273, 293 (6th Cir. 2018) (affirming federal district court's denial of federal habeas relief). Plaintiff also made (unsuccessful) attempts years ago to obtain post-conviction DNA analysis under the DNA Act and a post-conviction reopening of his case. *Carruthers v. State*, No. W2012-01473- CCA-R3-PD, 2013 WL 3968787, at *5 (Tenn. Crim. App. Aug. 1, 2013) (affirming denial of post-conviction DNA analysis under the DNA Act); *Carruthers v. State*, No. W2012-01361-CCA-R28-PD (Tenn. Crim. App. Sept. 10, 2012) (order dismissing appeal of motion to reopen)[6]; *Carruthers v. State*, No. W2016-01950- CCA-R3-PD (Tenn. Crim. App. Aug. 9, 2017) (order dismissing appeal of motion to reopen).[7]

On September 30, 2025, the Tennessee Supreme Court set Plaintiff's execution for May 21, 2026. (Doc. No. 24-3).[8] Thereafter, Plaintiff made a number of additional efforts to obtain

---

The Court, however, notes that although Plaintiff alleges—without providing any context—that he was "forced" to represent himself during his criminal trial, (Doc. No. 32 at ¶ 34), the Court cannot agree with this characterization. Indeed, as the Tennessee Supreme Court noted, Plaintiff was afforded counsel by the Tennessee state trial court on several occasions and ultimately forfeited his right to counsel based on his own inability to cooperate with his state-appointed counsel (including in one instance threatening the person and staff of one of his state-appointed counsel with violence). *State v. Carruthers*, 35 S.W.3d at 533-552. Put another way, Plaintiff's allegation that he was "forced" to represent himself at his criminal trial is, at best, misleading when the applicable circumstances are considered.

[6] A copy of this order is at Docket No. 24-1.

[7] A copy of this order is at Docket No. 24-2.

[8] A copy of the Tennessee Supreme Court order setting Plaintiff's execution is at Docket No. 24-3.

post-conviction relief, including filing a competency claim. *See State v. Carruthers*, Nos. 94-02797-99, 95-11128-29 (Shelby Cnty. Crim. Ct. Mar. 16, 2026) (order finding Plaintiff competent to be executed).[9]

c. *Plaintiff's Efforts to Obtain Post-Conviction Fingerprint and DNA Analysis*

This brings the Court to Plaintiff's efforts to obtain post-conviction fingerprint analysis and DNA analysis under the Fingerprint Act and the DNA Act, respectively. It is these efforts that underpin the instant lawsuit. Below, the Court first will review the Fingerprint Act, then turn to Plaintiff's efforts to obtain fingerprint analysis under that statute. Next, the Court will review the DNA Act and a Tennessee Supreme Court procedural rule that identifies the particular court in which to commence any state-court collateral litigation that would potentially affect the method or timing of execution, before turning to Plaintiff's efforts to obtain DNA analysis under the DNA Act.

**i. The Fingerprint Act and Plaintiff's Efforts to Obtain Post-Conviction Fingerprint Analysis**

Tennessee adopted the Fingerprint Act in 2021. The Fingerprint Act prescribes certain circumstances when post-conviction fingerprint analysis[10] may (or must) be conducted. Two sections of the Fingerprint Act are relevant for the instant action. The first is Tenn. Code Ann. § 40-30-404 and the second is Tenn. Code Ann. § 40-30-405.

Tenn. Code Ann. § 40-30-404 prescribes when a Tennessee state court *must* order fingerprint analysis. This section provides:

---

[9] A copy of this order is at Docket No. 24-4. A copy of Plaintiff's appellant's brief filed in in the appeal of the decision in *State v. Carruthers*, Nos. 94-02797-99, 95-11128-29 (Shelby Cnty. Crim. Ct. Mar. 16, 2026) is at Docket No. 24-5.

[10] The Fingerprint Act defines "fingerprint analysis" to be "the processes through which fingerprints are analyzed and compared for identification purposes, including, but not limited to, latent print comparisons and searches in fingerprint databases." Tenn. Code Ann. § 40-30-402.

> After notice to the prosecution and an opportunity to respond, the court shall order fingerprint analysis if the court finds that:
>
> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis;
>
> (2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;
>
> (3) The evidence was never previously subjected to fingerprint analysis, was not subjected to the analysis that is being requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-404. By contrast, Tenn. Code Ann. § 40-30-405 provides when a Tennessee state court *may* order fingerprint analysis. It provides:

> After notice to the prosecution and an opportunity to respond, the court may order fingerprint analysis if the court finds that:
>
> (1) A reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;
>
> (2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;
>
> (3) The evidence was not previously subjected to fingerprint analysis, was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-405.

As noted above, Plaintiff has attempted to obtain relief under the Fingerprint Act. On September 21, 2021, Plaintiff filed a petition in the Tennessee Criminal Court for Shelby County "requesting comparison of prints taken from Ms. Anderson's home with known latent prints of Ronnie Irving." *Tony Von Carruthers v. State of Tennessee*, No. W2026-00226-CCA-R3-PD, 2026 WL 1031140, at *6 (Tenn. Crim. App. Apr. 16, 2026). The Tennessee Criminal Court for Shelby

County summarily denied Plaintiff's petition, and Plaintiff appealed this denial to the Court of Criminal Appeals of Tennessee ("CCA"). In its opinion resolving that appeal, *Tony Von Carruthers v. State of Tennessee*, No. W2026-00226-CCA-R3-PD, 2026 WL 1031140 (Tenn. Crim. App. Apr. 16, 2026), the CCA stated (referring to Plaintiff as "Petitioner"):

> It appears that James Montgomery, in 2010 or 2011, alleged to a defense investigator that Ronnie Irving was the "kidnap man" involved in these crimes. The Petitioner argued that he would not have been prosecuted, convicted, or sentenced to death if the prints from Ms. Anderson's home had matched Mr. Irving's known prints. The post-conviction court summarily dismissed the petition, concluding that the Petitioner was not entitled to mandatory or discretionary testing. It is from this judgment that the Petitioner appeals.
>
> * * *
>
> On appeal, the Petitioner contends that the post-conviction court erred when it summarily dismissed his petition for post-conviction relief pursuant to the Fingerprint [] Act. The Petitioner also argues that the trial court should have, pursuant to the Fingerprint [] Act, considered evidence that one of the State's witnesses, Alfredo Shaw, was a paid informant. The State counters that the trial court properly denied the petition because the Petitioner failed to support his allegations in his petition. We agree with the State.

*Id.* at *6-7.[11] Ultimately, the CCA affirmed the denial of Plaintiff's petition for fingerprint analysis.

*Id.* at *10. In relevant part, the CCA reasoned:

> The Fingerprint [] Act provides for fingerprint analysis. It is not an avenue for relief for allegations of newly discovered evidence unrelated to fingerprint analysis. The Petitioner argues, however, that since the purpose of the Fingerprints [] Act is to exonerate those wrongfully convicted, we should consider this issue nonetheless. We decline to expand the role of the Fingerprint [] Act to encompass all claims of

---

[11] With respect to the CCA's summation of both the factual and procedural background underlying Plaintiff's request for fingerprint analysis and the arguments that Plaintiff and the State made as to Plaintiff's request for fingerprint analysis, the Court accepts the summation(s) as true based on the Court's own review of the copies of the briefing on Plaintiff's request for fingerprint analysis at Docket Nos. 1-1 and 1-11.

The reader may wonder to what extent the Court agrees with the merits of the CCA's decision to deny Plaintiff's request for fingerprint analysis in the Fingerprint Denial. The Court does not express an opinion as to merits of that decision. Expressing a gratuitous opinion on the merits of the Fingerprint Denial would serve no purpose, and expressing a purportedly consequential opinion would be improper because it would in effect make this Court an appellate court of the CCA in contravention of the *Rooker-Feldman* doctrine (a doctrine discussed further below).

innocence. Therefore, the trial court did not abuse its discretion when it declined to consider the credibility of a paid informant pursuant to the Fingerprint [] Act.

*Id.* at *9.[12]

### ii. The DNA Act and Plaintiff's Efforts to Obtain Post-Conviction DNA Analysis

Tennessee adopted the DNA Act in 2021. The DNA Act prescribes certain circumstances when post-conviction DNA analysis may (or must) be conducted.[13] Two sections of the DNA Act are relevant for the instant action. The first is Tenn. Code Ann. § 40-30-304 and the second is Tenn. Code Ann. § 40-30-305.

Tenn. Code Ann. § 40-30-304 prescribes when a Tennessee state court *must* order DNA analysis. This section provides:

> After notice to the prosecution and an opportunity to respond, the court shall order DNA analysis if it finds that:
> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. Tenn. Code Ann. § 40-30-305 provides when a Tennessee state court *may* order DNA analysis. It provides:

> After notice to the prosecution and an opportunity to respond, the court may order DNA analysis if it finds that:

---

[12] Herein, the Court at times will use the moniker "Fingerprint Denial." to refer to the CCA decision that affirmed the denial of Plaintiff's request for fingerprint analysis—*i.e.*, *Tony Von Carruthers v. State of Tennessee*, No. W2026-00226-CCA-R3-PD, 2026 WL 1031140 (Tenn. Crim. App. Apr. 16, 2026).

[13] The DNA Act defines "DNA analysis" to mean "the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes." Tenn. Code Ann. § 40-30-302.

(1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-305. In addition to these statutory provisions, the Tennessee Supreme Court has also adopted a rule ("Rule 12.4(E)") that identifies itself as the sole court in which to commence any state-court collateral litigation that would potentially affect the method or timing of execution, such as (potentially) a motion under the Fingerprint Act or DNA Act.[14] That rule (as amended in December 2025) provides in relevant part:

After a date of execution is set, any state court collateral litigation that would potentially affect the method or timing of execution must commence with the filing of a motion in this Court. Any response to the motion must be filed within five (5) days of the motion, unless a different response time is ordered by the Court. If the collateral litigation may involve fact-finding, the moving party must request the appointment of a special master, consistent with the procedures outlined in Tennessee Rule of Civil Procedure 53. Any response in opposition to the motion for a special master must be filed within five (5) days of the motion, unless a different response time is ordered by the Court. If the Court grants the motion for a special master, the Court may appoint a special master, consistent with the procedures outlined in Rule 53. Any objection to the findings of the special master shall be by motion filed in this Court not later than five (5) days after being served with notice of the filing of the report, unless a different response time is ordered by the Court.

Tenn. Sup. Ct. R. 12.4(E).

As noted above, Plaintiff has attempted to obtain relief under the DNA Act. One of those

---

[14] This rule thus carves out an exception to the Tennessee Supreme Court's customary role, which is to serve not as a forum for commencement of litigation but rather as a forum for appellate-level review of cases commenced in a lower court.

attempts—the most recent one—is relevant to the instant action.[15] Specifically, on April 9, 2026, pursuant to the DNA Act and Rule 12.4(E), Plaintiff filed a motion (Doc. No. 32-3, "First DNA Motion")[16] in the Tennessee Supreme Court seeking post-conviction DNA analysis.[17] The Tennessee Supreme Court rejected the First DNA Motion in an order dated April 30, 2026. That order provided, in full:

> Tony Carruthers, a death-row inmate scheduled for execution on May 21, 2026, has filed a pleading styled, "Motion for Post-Conviction DNA Testing and Request to Appoint a Special Master Pursuant to Tenn. S. Ct. R. 12.4(E)." In his motion, Mr. Carruthers is seeking the appointment of a special master, pursuant to a December 2025 amendment to Rule 12(4)(E), to adjudicate his request for additional testing under the Tennessee Post-Conviction DNA Analysis Act of 2001 ("DNA Act"). *See* Tenn. Code Ann. §§ 40-30-304, -305 (2024).

> Mr. Carruthers' motion is not well-taken. As the State asserts in its response in opposition to the motion, the December 2025 amendment to Rule 12(4)(E) neither created a new procedural avenue nor granted this Court original jurisdiction to adjudicate an eleventh-hour DNA claim that was not timely pursued via the existing DNA Act. See Tenn. S. Ct. R. 12(4)(E) (2025) (authorizing the appointment of a special master when deemed necessary by the Court to conduct fact-finding in pending state collateral litigation that "potentially affect[s] the method or timing" of an impending execution). Accordingly, the motion is DENIED.

> Further, because the motion is denied, the accompanying motion of Maria DeLiberato, American Civil Liberties Union, to appear pro hac vice on behalf of Mr. Carruthers in this matter is also DENIED.

> It is so ORDERED.

---

[15] Although it appears that Plaintiff also attempted unsuccessfully to obtain DNA analysis under the DNA Act beginning in 2011, *Carruthers v. State*, No. W2012-01473- CCA-R3-PD, 2013 WL 3968787, at *5 (Tenn. Crim. App. Aug. 1, 2013), (affirming denial of post-conviction DNA analysis under the DNA Act), these efforts at obtaining DNA analysis do not appear relevant to the instant Motions or the instant action.

[16] A copy of the First DNA Motion is at Docket No. 32-3.

[17] A copy of the order rejecting the First DNA Motion, which the Court refers to herein as the "DNA Denial" is at Docket No. 22-1.

(Doc. No. 22-1 at 2, "DNA Denial").[18] Subsequently, Plaintiff filed another motion ("Second DNA Motion") seeking DNA analysis in the Tennessee Criminal Court for Shelby County.[19] The Second DNA Motion was denied by the Tennessee Criminal Court for Shelby County in an order dated May 11, 2026.[20] Plaintiff has appealed that denial to the CCA.[21]

    2.  <u>Procedural Background and Plaintiff's Claims</u>

Plaintiff initiated this lawsuit on April 28, 2026 by filing his first complaint, therein asserting claims solely arising out of Plaintiff's efforts to obtain fingerprint analysis under the Fingerprint Act. (Doc. No. 1, "Complaint"). On May 8, 2026, Plaintiff filed the Amended Complaint, therein asserting: (i) the same claims that he asserted in the Complaint, *i.e.*, claims arising out of Plaintiff's efforts to obtain fingerprint analysis under the Fingerprint Act, and (ii) new claims, *i.e.*, claims related to Plaintiff's efforts to obtain DNA analysis under the DNA Act. (Doc. No. 32).

Specifically, via the Amended Complaint, Plaintiff challenges the Fingerprint Act and the DNA Act on "their face and as applied to [Plaintiff] by the State courts." (Doc. No. 32 at ¶ 6). Plaintiff also brings challenges to Rule 12.4(E). Plaintiff purports to bring *both* as-applied *and* facial challenges to the DNA Act and the Fingerprint Act (and potentially a facial challenge to Rule 12.4(E), though the Amended Complaint is unclear on this point). Nevertheless, the five claims that Plaintiff has laid out in the Amended Complaint, which variously challenge the

---

[18] In the Court's view, what the Tennessee Supreme Court is really trying to say is that Rule 12.4(E) does not provide a basis to file (i.e., "commenc[e]") an "eleventh-hour" motion for DNA analysis under the DNA Act (including the DNA Motion) in the Tennessee Supreme Court—even if such a motion could properly be filed ("commenced") in some other (state) court.

[19] A copy of Plaintiff's Second DNA Motion is at Docket No. 22-2.

[20] A copy of the order denying the Second DNA Motion is at Docket No. 36-1.

[21] A copy of Plaintiff's notice of appeal of the denial of his Second DNA Motion is at Docket No. 36-3.

Fingerprint Act, the DNA Act, and Rule 12.4(E), all seem to make *as-applied* challenges, as will be discussed below. However, Plaintiff does refer, at least in passing, to bringing facial challenges; thus, the Court will also address these facial challenges, such as they are, further below in its analysis of the merits of Plaintiff's claims.

Plaintiff brings five claims under 42 U.S.C. § 1983 ("Section 1983").[22] The Court will summarize each of these claims in turn, beginning with Plaintiff's claims related to his efforts to obtain fingerprint analysis under the Fingerprint Act, and then turning to Plaintiff's claims related to his efforts to obtain DNA analysis under the DNA Act.

a.  *Fingerprint Act Claims*

Plaintiff's first two claims arise out of Plaintiff's efforts to obtain fingerprint analysis under the Fingerprint Act.

Plaintiff's first claim (Doc. No. 32 at ¶¶ 97-142, "Claim One") alleges that "[t]he State's interpretation and application of its Fingerprint Act"[23] is violative of procedural due process

---

[22] Title 42 U.S.C. § 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws . . . ." To state a claim under Section 1983, a plaintiff must allege and show two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Panama Heights*, 437 F.3d 527, 533 (6th Cir. 2006)); 42 U.S.C. § 1983. As this Court has repeatedly indicated, a person is not a proper defendant in a Section 1983 action unless he or she is (or was) a person who violates the plaintiff's federal constitutional rights while "acting under color of state law." *See, e.g.*, *Crockett v. DCSO Med. Dep't*, No. 3:20-CV-00199, 2020 WL 5407717, at *3 (M.D. Tenn. Sept. 8, 2020). *See also Chaudhry v. Aragón*, 68 F.4th 1161, 1169 (9th Cir. 2023) (only persons acting under color of state law are proper defendants under § 1983). The reality is that the Amended Complaint (and the Motions, for that matter) does an inadequate job of explaining why particular Defendants violated any particular constitutional right of Plaintiff, although the Court declines to rely herein on that reality.

[23] Here and elsewhere, Plaintiff refers to the interpretation and application of statutes by "the State" when it is clear that "the State" actually means state *courts*, including (depending on the particular context) criminal (trial) courts, the Tennessee Court of Criminal Appeals, and the Tennessee Supreme Court. The undersigned of course does not speak for any Tennessee courts. But he imagines that they would take issue with being referred to as "the State" (not least because it routinely serves as a neutral adjudicator in cases styled as "State v. [Criminal Defendant]." The undersigned finds that moniker very inapt, and wonders whether it reflects an (unfortunate and misguided) attempt by Plaintiff—perhaps in an effort to disguise the

guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.[24] Via

Claim One, Plaintiff contends specifically (through the headers in his Amended Complaint) that

(1) the Tennessee courts' interpretation "of the Fingerprint Act imposes a near impossible burden

that violates [Plaintiff's] right to due process" (Doc. No. 32 at 27); (2) the Tennessee courts

"applied an improper temporal limitation in considering [Plaintiff's] request for testing under the

Fingerprint Act that resulted in a denial of due process" (Doc. No. 32 at 29); (3) the Tennessee

courts' "failure to analyze [Plaintiff's] request" for fingerprint analysis "under the permissive

provision of the Fingerprint Act violated his right to due process" (Doc. No. 32 at 31); (4) the

Tennessee courts "improperly dismissed the inculpatory effect of fingerprint results on third

---

fact that what he is primarily complaining about in this case are prior judicial decisions specifically on his own cases—to pass off case-specific decisions of the judicial branch of the State of Tennessee as acts of the executive and/or legislative branch of the State of Tennessee. To the extent that such an attempt was made, it failed.

[24] Here and in a footnote below, the Court will pause to make some comments regarding the relationship between the Bill of Rights (the first ten Amendments to the United States Constitution) and the Fourteenth Amendment. These remarks may be superfluous for those learned in constitutional jurisprudence but nevertheless are worth noting for the public.

Here and elsewhere, Plaintiff's invocation of the Fifth Amendment is inapt. "[T]he Fifth Amendment applies to the federal government, not state or local governments." *Mahan v. Shoupe*, No. CIV. 2:15-00001, 2015 WL 4693026, at *2 (M.D. Tenn. Aug. 6, 2015) (quoting *Myers v. Village of Alger, Ohio*, 102 F. App'x 931, 933 (6th Cir. 2004)). The Fifth Amendment "cannot support a claim against state [or local] actors." *Buchanan v. Metz*, 6 F.Supp.3d. 730, 757 n. 5 (E.D. Mich. 2014); *see Scott v. Clay Cnty.*, Tenn., 205 F.3d 867, 873 n.8 (6th Cir. 2000) ("The Fourteenth Amendment's Due Process Clause restricts the activities of the states and their instrumentalities; whereas the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government"). That is, the Due Process Clause of the Fifth Amendment is applicable solely to the federal government and not state governments; state governments are subject only to the Due Process Clause of the Fourteenth Amendment.

True, Plaintiff does assert violations of his rights also under the Fourteenth Amendment, and many rights in the Bill of Rights are deemed to be incorporated into the Fourteenth Amendment; as discussed below, this is true for the First Amendment. To this extent, a right found in the Bill of Rights (which is directly applicable only to the federal government) is implicated by a Fourteenth Amendment claim (which can be brought only against state actors and not federal actors). But the same is not true with respect to due process; the Due Process Clause of the Fifth Amendment is not deemed to be incorporated into the Fourteenth Amendment—presumably because such incorporation would be redundant since the Fourteenth Amendment also contains a due process clause. So the Court pays no heed to Plaintiff's references to the Fifth Amendment here or with respect to his other claims.

parties" in denying Plaintiff's request for fingerprint analysis (Doc. No. 32 at 33); and (5) the Tennessee courts' "summary dismissal of [Plaintiff's] request under the Fingerprint Act violated his right to due process." (Doc. No. 32 at 34). In sum, Plaintiff asserts via Claim One that "[s]ince the State of Tennessee provides a means for obtaining post-conviction fingerprint analysis, those procedures must be imbued with fundamental fairness" and that "because they were not [so imbued] here [as applied to Plaintiff], the State has violated [Plaintiff's] right to due process under the Fourteenth Amendment to the U.S. Constitution." (Doc. No. 32 at ¶ 142 (citations omitted)).

Plaintiff's second claim (Doc. No. 32 at ¶¶ 143-60, "Claim Two") alleges that the Tennessee courts' construal of the Fingerprint Act's provisions (and the application of these provisions to Plaintiff, particularly in the Fingerprint Denial) has denied Plaintiff meaningful access to the courts in violation of the First and Fourteenth Amendments to the United States Constitution.[25] Via Claim Two, Plaintiff specifically alleges that "the state court's refusal to allow the fingerprints to be tested, declining to acknowledge potentially exculpatory evidence, denies [Plaintiff] adequate, meaningful, and effective access to the courts through the appropriate application of the Fingerprint Act" (Doc. No. 32 at ¶ 153) and that Plaintiff has suffered "actual injury when the State courts denied his request for fingerprint testing." (*Id.* at ¶ 146).

As will be discussed in more detail below, Claim One and Claim Two are in substance based largely (and indeed it seems entirely) on the *construal and application* of the Fingerprint

---

[25] The First Amendment "applies to the States under the Due Process Clause of the Fourteenth Amendment." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996) (collecting cases). And, as just suggested, the Fourteenth Amendment by its terms applies to the States (and not the federal government). *See* U.S. Const. amend. XIV, § 1. The upshot is that in claims like Claim Two, technically the alleged violation is probably best considered only a violation of the Fourteenth Amendment (based on conduct that allegedly would violate the First Amendment were the implicated government actor(s) federal rather than state actor(s)). Nevertheless, in these situations, courts often speak in terms of "First Amendment" protections or violations without any reference (beyond an initial reference) to the Fourteenth Amendment.

Act *in Plaintiff's own state court proceedings* in the Tennessee Criminal Court for Shelby County and the CCA. And relatedly, Claim One and Claim Two are really claims challenging the prior denials by the Tennessee courts—either in the summary denial by the Tennessee Criminal Court for Shelby County or the Fingerprint Denial issued by the CCA—of Plaintiff's request for fingerprint analysis under the Fingerprint Act.

### b. DNA Act Claims

Plaintiff also brings three claims related to Plaintiff's efforts to obtain DNA analysis under the DNA Act. These three claims challenge both the DNA Act and Rule 12.4(E).

Plaintiff's third claim (Doc. No. 32 at ¶¶ 161-71, "Claim Three") contends that the Tennessee Supreme Court's construal and application of Rule 12.4(E) and of the DNA Act (specifically their application in the DNA Denial) has violated Plaintiff's rights to procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution. In particular, Plaintiff alleges that the Tennessee Supreme Court's application of Rule 12.4(E) "as it relates to the procedure for seeking DNA analysis under the DNA Act is 'fundamentally inadequate to vindicate the substantive rights provided [by the DNA Act].'" (Doc. No. 32 at ¶ 166 (citation omitted)). Plaintiff further alleges that the Tennessee Supreme Court's application of the DNA Act and Rule 12.4(E) is "unconstitutional because it violates fundamental fairness and impermissibly deprives prisoners like [Plaintiff], who are facing execution, of the ability to use and access state procedures in place to provide them with access to courts under extreme time-pressure." (Doc. No. 32 at ¶ 171). In other words, via the Third Claim, Plaintiff is challenging the Tennessee Supreme Court's construal and application of Rule 12.4(E) and the DNA Act to Plaintiff via the DNA Denial.

Plaintiff's fourth claim (Doc. No. 32 at ¶¶ 172-81, "Claim Four") alleges that the DNA

Act, as allegedly it will be applied to him by Tennessee courts in light of how they allegedly have construed the DNA Act in the past, is violative of procedural due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. Differing somewhat from Plaintiff's other claims, Claim Four actually is centered *not* on a past application of the DNA Act to Plaintiff by the Tennessee courts, but instead on what Plaintiff alleges is an "imminent threat that his due process rights *will* be violated *when* the Tennessee courts follow their longstanding practice of refusing to consider evidence discovered since trial when evaluating the exculpatory value of DNA evidence in his case— specifically in evaluating his Second DNA Motion." (Doc. No. 32 at ¶ 181 (emphasis added)). Plaintiff specifically contends that procedural due process is violated by Tennessee courts' construal of the DNA Act as preventing state courts from considering evidence that emerged *after* trial in considering a request for DNA analysis under the DNA Act. (Doc. No. 32 at ¶¶ 175-76).[26]

Finally, Plaintiff's fifth claim (Doc. No. 32 at ¶¶ 182-91, "Claim Five") alleges that the Tennessee Supreme Court's refusal to grant the First DNA Motion and permit Plaintiff's requested DNA analysis "denies [Plaintiff] adequate, meaningful, and effective access to the courts through the appropriate application of the DNA Act." (Doc. No. 32 at ¶ 190). In particular, via Claim Five Plaintiff alleges that the "Tennessee Supreme Court's unreasonable interpretation of the DNA Act and Tenn. S. Ct. R. 12.4(E) [in the DNA Denial] has prevented [Plaintiff] from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder and, therefore, should not be executed," (Doc. No. 32 at ¶ 186), that "the [Tennessee Supreme Court's] refusal to allow the DNA to be tested, declining to acknowledge potentially exculpatory evidence, denies

---

[26] Indeed, although the Second DNA Motion has now been denied by the Tennessee Criminal Court for Shelby County, that does not lead the Court to conclude that Claim Four is actually taking issue with that denial rather than a potential future application of the DNA Act to Plaintiff (for instance, in Plaintiff's appeal of that denial).

[Plaintiff] adequate, meaningful, and effective access to the courts through the appropriate application of the DNA Act," (Doc. No. 32 at ¶ 190), and that Plaintiff "incurred actual injury when the Tennessee Supreme Court denied his [] First DNA Motion." (Doc. No. 32 at ¶ 185).

In sum, of Plaintiff's claims related to the DNA Act (that is, Claim Three, Claim Four, and Claim Five), Claim Three and Claim Five are in substance challenges to a previous Tennessee state-court judgment against Plaintiff—that is, the Tennessee Supreme Court's ruling in the DNA Denial. By contrast, Claim Four challenges the alleged future application to Plaintiff—in the Tennessee courts' (ongoing) adjudication of Plaintiff's Second DNA Motion—of the DNA Act as Tennessee courts previously have construed it.

     c.  *Plaintiff's Requested Relief*

Via the Amended Complaint, Plaintiff seeks various forms of relief. This relief includes declarations that Tenn. Code Ann. §§ 40-30-404, 40-30-405 (the provisions of the Fingerprint Act reviewed by the Court earlier) and Tenn. Code. Ann. §§ 40-30-304, 40-30-305 (the provisions of the DNA Act reviewed by the Court earlier) as applied by the Tennessee courts are unconstitutional. (Doc. No. 32 at 46-47). Plaintiff also seeks a declaratory judgment that "Tennessee Supreme Court Rule 12.4(E), as applied by Tennessee state courts is unconstitutional under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution." (Doc. No. 32 at 48). Further, Plaintiff seeks injunctive relief requiring Defendants to conduct the fingerprint analysis and DNA analysis that the Tennessee courts have thus far refused to permit. (*Id.* at 48-49). Finally, Plaintiff seeks an injunction preventing Defendants from executing Plaintiff until the at-issue fingerprint analysis and DNA analysis is completed. (*Id.* at 49).

  3.  <u>The Motions and the Parties' Arguments</u>

Via the Motions, Plaintiff seeks relief that, although purportedly based on his allegations

in the Amended Complaint, is mostly if not completely different in timing and effect than the relief requested in the Amended Complaint.

As noted above, via the First Motion Plaintiff seeks an order "(1) granting [the] [First M]otion, (2) staying his execution currently scheduled for May 21, 2026, pending resolution of his [Amended] Complaint [p]ursuant to 42 U.S.C. § 1983, (3) entering a preliminary injunction enjoining Defendants from executing [Plaintiff] until this litigation is resolved, and (4) granting all other relief the Court deems appropriate." (Doc. No. 3 at 8). Plaintiff contends that he is entitled to a stay of his execution because, in addition to satisfying the other requirements for a stay of execution to issue (discussed further below), Plaintiff "is substantially likely to succeed on his [Fingerprint Act] claims in this case." (Doc. No. 3 at 2). The State Defendants assert in response that the Court should not grant a stay, arguing, among other things, that the Court lacks subject-matter jurisdiction over some or all of Plaintiff's claims under the *Rooker-Feldman* doctrine (Doc. No. 24 at 20-23) and that in any event Plaintiff lacks any likelihood of success on the merits of his as-applied or facial claims related to the Fingerprint Act. (*Id.* at 11-17).

Via the Second Motion, Plaintiff seeks an order "(1) granting [the] [Second M]otion, (2) staying this litigation pending resolution [by the Tennessee courts] of his pending request for DNA testing [via the Second DNA Motion pursuant to the DNA Act], (3) staying his execution currently scheduled for May 21, 2026, pending resolution of this litigation, and (4) granting all other relief the Court deems appropriate." (Doc. No. 22 at 5).[27] With respect to Plaintiff's request to stay his execution, Plaintiff contends that with respect to his claims related to the DNA Act, he "has established the four prongs for a stay of execution." (Doc. No. 22 at 4-5). The State Defendants

---

[27] As noted above, Plaintiff's Second DNA Motion was denied by the Tennessee Criminal Court for Shelby County. An appeal of that denial is now pending.

oppose the Motion. (Doc. No. 26).[28]

LEGAL STANDARD[29]

To obtain a stay of execution a plaintiff must satisfy a four-requirement test, just as he would when moving for a preliminary injunction. *See Smith v. Lee*, No. 3:22-CV-00280, 2022 WL 1182699, at \*1 (M.D. Tenn. Apr. 20, 2022) (noting that the standard for injunctive relief in a capital Section 1983 case (such as a request for a stay of execution) is the same as "in other types of cases" for injunctive relief).[30] He must show: (1) a likelihood of success on the merits; (2) he will suffer irreparable harm absent a stay; (3) the stay will not cause substantial harm to others; and (4) the stay would serve the public interest. *See Nichols v. Skrmetti*, No. 3:25-CV-442, 2025 WL 3299727, at \*31 n.50 (M.D. Tenn. Nov. 26, 2025) (citing *Workman v. Bell*, 484 F.3d 837, 839 (6th Cir. 2007)).[31] In considering the first requirement for a stay of execution, the Sixth Circuit

---

[28] The Second Motion was filed *prior* to Plaintiff filing the Amended Complaint and thus was filed *prior* to Plaintiff raising his claims relating to his attempts to achieve DNA analysis. Arguably it was improper to request a stay of his execution and a stay of this litigation based on claims not yet raised. *Cf. Hairston v. Franklin Cnty. Sheriff's Off. Ctr. Main Jail 1*, No. 2:17-CV-581, 2018 WL 1007512, at \*1 (S.D. Ohio Feb. 22, 2018) ("a district court does not have the authority to issue injunctive relief on the basis of claimed injuries or actions that are unrelated to the allegations in the movant's complaint." (citing *Colvin v. Caruso*, 605 F.3d 282, 299-300 (6th Cir. 2010))), *report and recommendation adopted sub nom. Hairston v. Franklin Cnty. Sheriff's Off. Ctr. 1 Main Jail,* No. 2:17-CV-581, 2018 WL 3117522 (S.D. Ohio June 25, 2018); *Hutchins v. Simmons*, No. 2:23-CV-13224, 2024 WL 4132668, at \*3 (E.D. Mich. Sept. 10, 2024) ("And generally, courts may not enjoin parties from taking action based on allegations and claims not presented in the complaint.").
  Even so, given that Plaintiff has now raised claims related to his efforts to conduct DNA analysis in his Amended Complaint, and given the time-sensitive nature of Plaintiff's action and requested relief via the Second Motion, the Court herein will consider Plaintiff's request for a stay of this litigation and stay of execution raised in the Second Motion.

[29] The Court's legal standard here addresses solely Plaintiff's request for a stay of his execution. Plaintiff's request for a stay of this litigation will be discussed separately and further below.

[30] For this reason, to speak of the requirements for a preliminary injunction generally is the same as speaking of the requirements for a stay of execution, and vice versa, and below the Court at times will cite and discuss case law detailing these aforementioned requirements in a preliminary injunction context that does not discuss or directly implicate a request for a stay of execution.

[31] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that likelihood of success on the merits seems to be a requirement (and, if

(quoting the Supreme Court) has noted that the movant "must show a 'significant possibility of

it exists and thus keeps the possibility of a stay of execution alive, thereafter becomes a factor to be balanced along with the other three factors). *See e.g., Zagorski v. Haslam*, 741 F. App'x 320, 321 (6th Cir. 2018) ("likelihood of success is often the determinative factor"); *Workman v. Bredesen*, 486 F.3d 896, 911 (6th Cir. 2007) ("the absence of any meaningful chance of success on the merits suffices to resolve this matter."). *But see Hartman v. Bobby*, 319 F. App'x 370, 371-72 (6th Cir. 2009) (granting stay of execution while declining one way or another to determine whether movant had shown a likelihood of success on the merits). Alas this case law is inconsistent with some Supreme Court case law. *See e.g., Hill v. McDonough*, 547 U.S. 573, 584 (2006) ("Thus, like other stay applicants, inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the *requirements* for a stay, *including* a showing of a significant possibility of success on the merits" (emphasis added)).

Importantly, other courts have also treated these four items as "requirements" (prerequisites) rather than as factors. *See Wood v. Ryan*, 759 F.3d 1117, 1120 (9th Cir. 2014) (referring to the "requirements" for a stay of execution to issue); *Valle v. Singer*, 655 F.3d 1223, 1225 (11th Cir. 2011) (finding a stay of execution warranted only if a moving party shows: "(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest."). *See also Nichols*, 2025 WL 3299727, at *31 n.50 (referring to the *requirements* a plaintiff must satisfy in order to obtain a stay of execution).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motions does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion to stay execution. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually likelihood of success on the merits *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors). *See e.g., Workman v. Bredesen*, 486 F.3d at 911 ("the absence of any meaningful chance of success on the merits suffices to resolve this matter"); *Cooey v. Strickland*, 604 F.3d 939, 946 (6th Cir. 2010) (because plaintiff "cannot make any showing that he has any likelihood of success, we find the first factor dispositive"). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. Third, given that the standard for staying an execution is the same as the standard for the issuance of other types of preliminary injunctive relief, *see e.g., Nichols*, 2025 WL 3299727, at *31 n.50; *Smith*, 2022 WL 1182699, at *1, treating these four items as requirements rather than factors is congruous with (some, but not all) Sixth Circuit and Supreme Court precedent governing the issuance of preliminary injunctions. *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 328-29 (6th Cir. 2019) (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff must establish the factors" to justify the issuance of injunctive relief and questioning "whether the balancing analysis itself aligns with *Winter*.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the *issue* of *whether* issuing the stay of execution would harm others (factor-style language) rather than the *requirement* that the balance of equites favors the movant, or by referring to the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors a stay of execution. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein.

success on the merits' in order to obtain a stay." *Bell*, 484 F.3d at 839 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)).

Crucially, "a stay of execution is an equitable remedy." *Hill*, 547 U.S. at 584. "It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.*

Further, when addressing a request to stay an execution, the Court must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell,* 541 U.S. 637, 649–50 (2004). Indeed, there is "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.* at 650. *See also Gomez v. United States Dist. Court for Northern Dist. of Cal.,* 503 U.S. 653, 654 (1992) (*per curiam*) (noting that the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process may be grounds for denial of a stay).

DISCUSSION

In addressing Plaintiff's Motions, the Court will begin by analyzing concurrently Plaintiff's two requests to stay his execution, i.e., the request to stay Plaintiff's execution made in the First Motion and the request to stay Plaintiff's execution made in the Second Motion. The Court will begin this analysis by considering the likelihood of success on the merits that Plaintiff has as to each of his claims. Ultimately, because the Court concludes that Plaintiff lacks a significant likelihood of success on each of his claims, the Court will not examine the other requirements for a stay of execution.

After considering Plaintiff's requests for a stay *of execution*, the Court will then consider Plaintiff's request—made in the Second Motion—to stay *this action*.

1. <u>Stay of Execution</u>

    a.   *Subject-Matter Jurisdiction and Its Relationship to Likelihood of Success on the Merits and the Rooker-Feldman Doctrine*

Subject-matter jurisdiction is "relevant to [the] likelihood of success [on the merits]" requirement for a preliminary injunction. *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022). *See also U.S. Ass'n of Importers of Textiles & Apparel v. U.S. Dep't of Com.*, 413 F.3d 1344, 1348 (Fed. Cir. 2005) (considering, in determining likelihood of success on the merits, whether the court could exercise subject matter jurisdiction over particular claims); *Smith*, 2022 WL 1182699, at *9 ("The court, therefore, lacks subject matter jurisdiction to consider the claims brought by the plaintiff. As a result, the plaintiff has no likelihood of prevailing on the merits of his claims and is not entitled to injunctive relief [in the form of a stay of execution."). This only makes sense; after all, if a court is unable to exercise subject-matter jurisdiction over a particular claim, then it necessarily follows that a plaintiff would not have a likelihood of success on the merits (or even a likelihood of *having the court reach* the merits) of that claim. Here, the State Defendants have raised serious arguments, based on the *Rooker-Feldman* doctrine, as to this Court's subject-matter jurisdiction to adjudicate Plaintiff's claims. Below, the Court will first review this doctrine and then discuss its applicability to Plaintiff's claims.

### i. The Rooker-Feldman Doctrine

The *Rooker-Feldman* doctrine implicates the subject-matter jurisdiction of the federal courts. *Durham v. Haslam*, 528 F. App'x 559, 565 (6th Cir. 2013). The *Rooker-Feldman* doctrine originates from two Supreme Court cases—*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983)—which held that "lower federal courts lack subject matter jurisdiction to engage in appellate review of state court proceedings." *Hood v. Keller*, 341 F.3d 593, 597 (6th Cir. 2003) (quoting *Peterson Novelties, Inc. v. City of Berkley*, 305

F.3d 386, 390 (6th Cir. 2002)). Under the *Rooker-Feldman* doctrine, federal courts should not hear "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). A complaint that "essentially invite[s] federal courts of first instance to review and reverse unfavorable state-court judgments" should be "dismissed for want of subject-matter jurisdiction." *Id.* at 283–84. That is because "appellate jurisdiction to reverse or modify a state-court judgment is lodged . . . exclusively in" the United States Supreme Court—not a federal district court. *Id.* at 283 (citations omitted). Importantly, the jurisdictional limit embodied by the *Rooker-Feldman* doctrine is "properly applied on a claim-by-claim basis." *In re Isaacs*, 895 F.3d 904, 912 (6th Cir. 2018) (citing *Hall v. Callahan*, 727 F.3d 450, 453–57 (6th Cir. 2013); *McCormick v. Braverman*, 451 F.3d 382, 392–96 (6th Cir. 2006)).

The *Rooker-Feldman* doctrine divests the court of subject-matter jurisdiction "in those circumstances where a party initiates an action in federal district court 'complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment.'" *In re Cook*, 551 F.3d 542, 548 (6th Cir. 2009) (quoting *Exxon Mobil*, 544 U.S. at 291). Thus, the "pertinent question in determining whether a federal district court is precluded under the *Rooker-Feldman* doctrine from exercising subject-matter jurisdiction over a claim 'is whether the source of the injury upon which plaintiff bases his federal claim is the state court judgment.'" *In re Cook*, 551 F.3d at 548 (quoting *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008)). The source of a plaintiff's injury may be "determined by examining the request for relief." *In re Isaacs*, 895 F.3d at 912. And if the "request for relief effectively asks" the federal court to invalidate a state-court judgment, then that relief clearly identifies the state-court judgment as the source of a plaintiff's

injury. *Id.* But "if the source of the plaintiff's injury is not actually the actions or decisions of a state court, then the *Rooker-Feldman* doctrine does not bar the court from hearing the plaintiff's claims." *Smith*, 2022 WL 1182699, at *6.

Three additional points bear mentioning in the Court's review of the *Rooker-Feldman* doctrine. First, "[w]here the plaintiff alleges that a state court interpreted and applied a state statute to *her case* in an unconstitutional manner, her complaint is an as-applied constitutional challenge and is prohibited under the *Rooker–Feldman* doctrine." *Durham*, 528 F. App'x at 564 (emphasis added). *See also Smith*, 2022 WL 1182699, at *8 (finding as-applied challenge to Tennessee courts' interpretation of DNA Act barred by the *Rooker-Feldman* doctrine). However, "the *Rooker–Feldman* doctrine does not bar as-applied constitutional challenges seeking prospective relief as long as 'the source of [the plaintiff]'s alleged injury is not the past state court judgments' but 'the purported unconstitutionality of [the statute] as applied in future cases.'" *Hall*, 727 F.3d at 455 n.3 (quoting *Fieger v. Ferry*, 471 F.3d 637, 646 (6th Cir. 2006)).

Second, the "*Rooker-Feldman* doctrine 'does not prohibit federal district courts from exercising jurisdiction where the plaintiff's claim is merely a general [*i.e.* facial] challenge to the constitutionality of the state law applied in the state action, rather than a challenge to the law's application in a particular state case.'" *Carter v. Burns*, 524 F.3d 796, 798 (6th Cir. 2008) (quoting *Hood v. Keller*, 341 F.3d 593, 597 (6th Cir. 2003)). *See also Smith*, 2022 WL 1182699, at *7 ("Notably, a facial challenge to the constitutionality of a state statute is not barred by *Rooker-Feldman*.").

Third and finally, the case of *Skinner v. Switzer*, 562 U.S. 521 (2011), warrants some explanation. As Judge Trauger of this Court has explained regarding *Skinner*:

> In *Skinner v. Switzer*, the [Supreme Court] declined to extend the [*Rooker-Feldman*] doctrine to a § 1983 case brought by a state prisoner who had been

> convicted of capital murder and sentenced to death, alleging that the state district attorney's refusal to allow him access to biological evidence for purposes of forensic DNA testing violated his right to due process. The Court found, in light of *Exxon Mobil*, that the prisoner's case "encounter[ed] no *Rooker-Feldman* shoal," as it presented an "independent claim" [from the underlying state-court judgment]. *Skinner*, 562 U.S. at 532. [In *Skinner*], the plaintiff "did not challenge the adverse [state court] decisions themselves." *Id.* Rather, he "target[ed] as unconstitutional the Texas statute they authoritatively construed." *Id.* As a result, the Court concluded, the federal courts did not lack subject matter jurisdiction over his suit.

*Smith*, 2022 WL 1182699, at *6. Put another way, although *Skinner* teaches that the *Rooker-Feldman* doctrine does not necessarily bar either general (i.e., facial) challenges to the constitutionality of a state statute as construed by state courts or as-applied challenges to the constitutionality of a statute as applied to the plaintiff *in future cases* (i.e., challenges where a plaintiff alleges that if a court were to called upon to apply the statute in a future case involving the plaintiff, it is already clear that the statute would be applied so as to violate the plaintiff's rights in some manner), *Skinner* does not undercut the Sixth Circuit's clear rule that the *Rooker-Feldman* doctrine bars attacks on as-applied challenges *to prior state-court decisions* where a plaintiff alleges that a state court interpreted and applied a state statute to her case in an unconstitutional manner. That said, the Court will now turn to examining which, if any, of Plaintiff's claims are barred by the *Rooker-Feldman* doctrine.

### ii. Plaintiff's Claims

As an initial matter, to the extent that Plaintiff brings (or purports to bring) facial challenges to Tennessee courts' interpretation of the Fingerprint Act, the DNA Act, or Rule 12.4(E), these facial claims are not barred by the *Rooker-Feldman* doctrine. *See Carter*, 524 F.3d at 798; *Smith*, 2022 WL 1182699, at *7. That leaves Plaintiff's as-applied claims challenging the application of the Fingerprint Act, the DNA Act, or Rule 12.4(E). As noted above, "[w]here the plaintiff alleges that a state court interpreted and applied a state statute to her case in an unconstitutional manner,

her complaint is an as-applied constitutional challenge and is prohibited under the *Rooker–Feldman* doctrine." *Durham*, 528 F. App'x at 564. However, the doctrine does not bar "as-applied constitutional challenges seeking prospective relief as long as 'the source of [the plaintiff]'s alleged injury is not the past state court judgments' but 'the purported unconstitutionality of [the statute] as applied in future cases.'" *Hall*, 727 F.3d at 455 n.3.

Here, it is apparent that at least via Claim One, Claim Two, Claim Three and Claim Five, Plaintiff specifically challenges *particular prior adverse state court rulings against him* (collectively, "Prior Adverse Rulings"). Specifically, Plaintiff challenges (i) via Claim One and Claim Two, the rulings of the Tennessee Criminal Court for Shelby County and the CCA (collectively, "Fingerprint-Act Denials") denying his requests in *his particular state court cases* for fingerprint analysis under the Fingerprint Act; and (ii) via Claim Three and Claim Five the ruling from the Tennessee Supreme Court denying his First DNA Motion, i.e., the DNA Denial.

That each of these four claims is complaining specifically about one or more of the Prior Adverse Rulings is clear from the Amended Complaint. The Court will below repeat largely verbatim the telltale allegations from the Amended Complaint, beginning with Plaintiff's claims made in connection with the Fingerprint Act, *i.e.*, Claim One and Claim Two.

With respect to Claim One, Plaintiff alleges—quoting at various times from the CCA decision in the Fingerprint Denial:

- "The Tennessee courts violated [Plaintiff's] due process rights by interpreting the Fingerprint [] Act to require a standard far more demanding than the already challenging 'reasonable probability' standard required by the Fingerprint Act." (Doc. No. 32 at ¶ 105).

- "By asking whether the fingerprint results would 'eliminate the possibility' of [Plaintiff's] involvement, the State courts applied what amounts to a conclusive proof-of-innocence standard—a standard that is far more stringent than even the 'reasonable probability' standard mandated by the Fingerprint Act." (Doc. No. 32 at ¶ 109 (citation omitted)).

- "By demanding that [Plaintiff] demonstrate that the fingerprint evidence would eliminate

the possibility of his involvement entirely, the State courts imposed an insurmountable burden that the Legislature did not intend and that no petitioner could realistically satisfy." (Doc. No. 32 at ¶ 110).

- "In fact, the State court's opinion [in the Fingerprint Denial] suggests that [Plaintiff] did meet the statutory standard—had it been applied correctly. The appellate court found: 'At best, any alleged exculpatory information would have led to a possible fourth participant in these crimes.'" (Doc. No. 32 at ¶ 111 (citation omitted))

- "The state courts' misapplication of the statutory standard [in the Fingerprint Denial and in the summary dismissal of Plaintiff's request for fingerprint analysis by the Tennessee Criminal Court for Shelby County] deprived [Plaintiff] of his liberty interest in utilizing state procedures to demonstrate his innocence in violation of the Due Process Clause of the Fourteenth Amendment." (Doc. No. 32 at ¶ 112).

- "In denying [Plaintiff's] request under the Fingerprint Act, the State courts violated fundamental fairness by improperly imposing a temporal limitation on the evidence to be considered and refusing to consider new evidence." (Doc. No. 32 at ¶ 113).

- "The State courts also refused to consider other evidence that has come to light since [Plaintiff's] trial that, considered with the fingerprints, unquestionably increases the probability that [Plaintiff] would not have been prosecuted, convicted, or sentenced to death[.]" (Doc. No. 32 at ¶ 117).

- "[T]he State courts denied [Plaintiff's] right to due process by depriving him of the meaningful opportunity the legislature intended to provide for in enacting the Fingerprint Act—i.e., demonstrating innocence through post-conviction fingerprint analysis." (Doc. No. 32 at ¶ 120).

- "The State courts further violated [Plaintiff's] due process rights by failing to fully analyze and consider his petition under the permissive provision of the Fingerprint Act." (Doc. No. 32 at ¶ 121).

- "As such, [Plaintiff] had an interest in having the court meaningfully consider whether the requested fingerprint analysis would have rendered his verdict or sentence more favorable. The State courts' failure to meaningfully consider and engage in that analysis under the permissive provision of the Fingerprint Act deprived [Plaintiff's] of his constitutionally protected liberty interest afforded by the Act." (Doc. No. 32 at ¶ 127).

- "The State courts' analysis also violated [Plaintiff's] due process rights by dismissing the significance of fingerprint evidence that would inculpate a third party. The court concluded that '[a]t best, any alleged exculpatory information would have led to a possible fourth participant in these crimes,' and that '[e]ven if the analysis revealed exactly what the Petitioner [(i.e., Plaintiff in this action)] asserts, it would not have undermined the significant evidence against him unrelated to those fingerprints.'" (Doc. No. 32 at ¶ 128).

- "Therefore, the State courts' refusal to credit this evidence as potentially exculpatory deprived [Plaintiff] of the fair and meaningful process to which he is constitutionally entitled." (Doc. No. 32 at ¶ 134).

- "The state courts violated [Plaintiff's] procedural due process rights by arbitrarily denying fingerprint analysis when his petition satisfied the requirements of the Fingerprint Act on its face." (Doc. No. 32 at ¶ 135).

- "Because [Plaintiff] satisfied the statutory requirements on the face of his pleadings, the State courts' summary dismissal of his petition [requesting fingerprint analysis] deprived him of his liberty interest in using state procedures to demonstrate his innocence." (Doc. No. 32 at ¶ 140).

And with respect to Claim Two, Plaintiff alleges:

- "[Plaintiff] has incurred actual injury when the State courts denied his request for fingerprint testing." (Doc. No. 32 at ¶ 146).

- "[T]he state court's refusal to allow the fingerprints to be tested, declining to acknowledge potentially exculpatory evidence, denies [Plaintiff] adequate, meaningful, and effective access to the courts through the appropriate application of The Post-Conviction Fingerprint Act." (Doc. No. 32 at ¶ 153).

- "The court's omission of a specific analysis [in the Fingerprint Denial] of the discretionary statue unfairly limits [Plaintiff's] ability to seek the legal post-conviction remedies available to him under state law." (Doc. No. 32 at ¶ 159).

- "[The state courts'] failures have deprived [Plaintiff] of his fundamental right to access to courts under the First and Fourteenth Amendments." (Doc. No. 32 at ¶ 160).

Taken together, these allegations make one thing clear: via his claims in Claim One and Claim Two, Plaintiff is challenging specifically the Fingerprint-Act Denials, and not the constitutionality of the Fingerprint Act *as authoritatively construed* by the state courts. Plaintiff characterizes these claims as mere "challenges [to] whether [the Fingerprint Act] 'as authoritatively construed,' comports with fundamental fairness under the Due Process Clause" (Doc. No. 33 at 3)—and asserts that these claims are not barred by the *Rooker-Feldman* doctrine, given *Skinner*'s holding (562 U.S. at 532) that the doctrine is inapplicable to challenges to a statute as "authoritatively construed" by state courts. The Court rejects Plaintiff's characterization of these

claims, which is belied by the above-quoted allegations in the Amended Complaint. It is clear to the Court that Plaintiff is "directly challeng[ing]" the Fingerprint-Act Denials. Indeed, Claim One and Claim Two are replete with allegations (set forth above) concerning the Tennessee courts' (alleged) failures to appropriately apply the Fingerprint Act. *See Smith*, 2022 WL 1182699, at *7 (rejecting Plaintif's contention that his claim was permitted by *Skinner*, rather than barred by the *Rooker-Feldman* doctrine, because it was clear that a Plaintiff "specifically and directly challenges the state courts' adverse determination of his motion for relief under the [] the DNA Act.").

Moreover, Claim One and Claim Two are both based on alleged injury derived precisely from the Fingerprint-Act Denials. Indeed, with respect to Claim One, Plaintiff alleges (as set forth above) that "[t]he state courts violated [Plaintiff's] procedural due process rights by arbitrarily denying fingerprint analysis when his petition satisfied the requirements of the Fingerprint Act on its face." (Doc. No. 32 at ¶ 135). Likewise, with respect to Claim Two, Plaintiff alleges (as also set forth above) that he "incurred actual injury when the State courts denied his request for fingerprint testing." (Doc. No. 32 at ¶ 146). These allegations—among others—reveal the true nature of Plaintiff's claims in Claim One and Claim Two; they amount to complaints about an injury caused directly and specifically by prior state-court judgments, namely the Fingerprint-Act Denials. *See In re Cook*, 551 F.3d at 548 (noting that the *Rooker-Feldman* doctrine applies "in those circumstances where a party initiates an action in federal district court 'complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment'").

What's more, a review of Plaintiff's requested relief shows that Plaintiff is asking this Court, at least in part, to overturn the judgment of the Tennessee courts. In fact, Plaintiff requests that the Court order fingerprint analysis of essentially the same character that the Tennessee courts had previously declined to order. (Doc. No. 32 at 48). By seeking via Claim One and Claim Two

relief that (at least in part) "effectively asks" this Court to invalidate these Tennessee state-court judgments, Plaintiff has shown that it is these Tennessee state-court judgments (denying him fingerprint analysis) that are the source of his injury underlying these claims. *In re Isaacs*, 895 F.3d at 912. *Cf. Welch,* 531 F.3d at 370–71 (finding the plaintiff's action barred by *Rooker–Feldman* because "[although] the redress [the plaintiff] seeks . . . is forward-looking, the claim is nonetheless premised on the same past injury: [a past state decision denying him bar admission]").

In summary, Claim One and Claim Two specifically seek effectively to overturn Tennessee state-court decisions that have already occurred—i.e., the Fingerprint-Act Denials—and are based on an injury derived from these state-court judgments. Accordingly, they are barred by the *Rooker-Feldman* doctrine, and therefore the Court lacks subject-matter jurisdiction to adjudicate them. *Durham*, 528 F. App'x at 564 ("[w]here the plaintiff alleges that a state court interpreted and applied a state statute to her case in an unconstitutional manner, her complaint is an as-applied constitutional challenge and is prohibited under the *Rooker–Feldman* doctrine."); *Smith*, 2022 WL 1182699, at *7 (finding the plaintiff's claim barred by the *Rooker-Feldman* doctrine when it was clear that a Plaintiff "specifically and directly challenges the state courts' adverse determination of his motion for relief under the [] the DNA Act.").

The Court necessarily reaches a similar conclusion with respect to Plaintiff's claims arising out of his efforts to obtain DNA analysis under the DNA Act, namely Claim Three (which challenges specifically the Tennessee Supreme Court's construal and application of Rule 12.4(E) and the DNA Act in the DNA Denial) and Claim Five (which challenges specifically the Tennessee Supreme Court's denial of the First DNA Motion in the DNA Denial). With respect to Claim Three, Plaintiff alleges—quoting at times the DNA Denial:

- "When he filed his First DNA Motion, [Plaintiff] had a scheduled execution date set. In his First DNA Motion, [Plaintiff] sought DNA testing of several pieces of evidence, which are

still in existence and have never been subjected to DNA testing. The results of that requested DNA testing could potentially affect not just the timing of [Plaintiff's] execution but the entire foundation for his execution in the first place. As such, the First DNA Motion was filed with the Tennessee Supreme Court pursuant to Rule 12.4(E)." (Doc. No. 32 at ¶ 169 (citation omitted)).

- "However, in the DNA Denial, the [the Tennessee Supreme Court] conclude[d] that Rule 12.4(E) does not grant the Tennessee Supreme Court 'original jurisdiction to adjudicate an eleventh-hour DNA claim that was not timely pursued via the existing DNA Act.' The Court provides no explanation of where the First DNA Motion should have been filed under Rule 12.4(E). Nor does it explain why the First DNA Motion is 'untimely' when the DNA Act does not provide any statutory time limits." (Doc. No. 32 at ¶ 170 (citation omitted)).

- "The State's arbitrary interpretation and application of the DNA Act and Rule 12.4(E) is unconstitutional because it violates fundamental fairness and impermissibly deprives prisoners like [Plaintiff], who are facing execution, of the ability to use and access state procedures in place to provide them with access to courts under extreme time-pressure." (Doc. No. 32 at ¶ 171).

And with respect to Claim Five, Plaintiff alleges—again quoting the DNA Denial:

- "[Plaintiff] incurred actual injury when the Tennessee Supreme Court denied his [] First DNA Motion." (Doc. No. 32 at ¶ 185).

- "The [Tennessee Supreme Court's] statement that [the First] DNA Motion is an 'eleventh-hour DNA claim' and 'not timely purs[u]ed' is an unreasonable interpretation and an arbitrary application of this statute. The outcome of this interpretation is contrary to the intention of this statute to give prisoners like [Plaintiff] access to post-conviction remedies." (Doc. No. 32 at ¶ 188 (citation omitted)).

- "Furthermore, the court's arbitrary conclusion that the First DNA Motion was not properly filed with the Tennessee Supreme Court when the plain language of Rule 12.4(E) states, '[a]fter a date of execution is set, any state court collateral litigation that would potentially affect the method or timing of execution must commence with the filing of a motion in this Court' denied [Plaintiff] of the exact type of streamlined access to the [S]upreme [C]ourt that Rule 12.4(E) contemplates." (Doc. No. 32 at ¶ 189 (citation omitted)).

- "As a result, the court's refusal to allow the DNA to be tested, declining to acknowledge potentially exculpatory evidence, denies [Plaintiff] adequate, meaningful, and effective access to the courts through the appropriate application of the DNA Act." (Doc. No. 32 at ¶ 190).

Taken together, these allegations make clear that via Claim Three and Claim Five, Plaintiff is challenging specifically the DNA Denial—that is, the Tennessee Supreme Court's adverse

ruling regarding Plaintiff's requests in *his particular state court case* for DNA analysis under the DNA Act—and not the DNA Act or Rule 12.4(E) *as authoritatively construed*. Indeed, Plaintiff's allegations with respect to Claim Three and Claim Five are in substance premised (seemingly entirely) on the (alleged) errors that the Tennessee Supreme Court made in the DNA Denial. *See Smith*, 2022 WL 1182699, at \*7 (finding the plaintiff's claim barred by the *Rooker-Feldman* doctrine when it was clear that the plaintiff "specifically and directly challenges the state courts' adverse determination of his motion for relief under the [] the DNA Act.").

Moreover, Plaintiff's allegations make plain that Claim Three and Claim Five are both based on alleged injury derived precisely from the DNA Denial. Indeed, Plaintiff alleges with respect to Claim Five that he "incurred actual injury when the Tennessee Supreme Court denied [in the DNA Denial] his [] First DNA Motion." (Doc. No. 32 at ¶ 185). And the harm alleged in Claim Three allegedly stems from the Tennessee Supreme Court having pronounced that "Rule 12.4(E) does not grant the Tennessee Supreme Court 'original jurisdiction to adjudicate an eleventh-hour DNA claim that was not timely pursued via the existing DNA Act,'" without giving, according to Plaintiff, any "explanation of where the First DNA Motion should have been filed under Rule 12.4(E)" or an explanation as to why "the First DNA Motion is 'untimely' when the DNA Act does not provide any statutory time limits." (Doc. No. 32 at ¶ 170). These allegations— among others—make plain the true nature of Plaintiff's claims in Claim Three and Claim Five. That is, these claims complain of an injury suffered by Plaintiff as a result of a prior state-court judgment—the DNA Denial—and are challenges to that judgment.[32] *In re Cook*, 551 F.3d at 548

---

[32] The reader may wonder whether state court decisions on post-conviction motions—like those in the Fingerprint-Act Denials and the DNA Denial—qualify as state-court "judgments" so as to be implicated by the *Rooker-Feldman* doctrine. The short answer—although district courts rarely spell this out explicitly— is yes, and district courts regularly find federal challenges to state court decisions on post-conviction relief to be barred by the *Rooker-Feldman* doctrine. *E.g., Smith*, 2022 WL 1182699, at \*7 (finding plaintiff seeking review of state court "judgment" on a motion under the DNA Act barred by *Rooker-Feldman*

(stating that the *Rooker-Feldman* doctrine applies "in those circumstances where a party initiates an action in federal district court 'complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment'").

Moreover, a review of Plaintiff's requested relief reveals that Plaintiff is asking this Court, at least in part, to overturn the judgment of the Tennessee Supreme Court. In fact, Plaintiff requests that the Court order DNA analysis of essentially the same character that the Tennessee Supreme Court previously declined to order. (Doc. No. 32 at 48-49). By seeking via Claim Three and Claim Five relief that (at least in part) "effectively asks" this Court to invalidate a Tennessee state-court judgment, Plaintiff has shown that it is that Tennessee state-court judgment (denying him DNA analysis) that is the source of his injury underlying these claims. *In re Isaacs*, 895 F.3d at 912. *Cf. Welch,* 531 F.3d at 370–71 (plaintiff's action barred by the *Rooker–Feldman* doctrine because "while the redress [the plaintiff] seeks . . . is forward-looking, the claim is nonetheless premised on the same past injury: [a past state decision denying him bar admission]").

In sum, Claim Three and Claim Five challenge a state-court decision from the Tennessee Supreme Court (the DNA Denial), are based on an injury derived from that state-court judgment,[33] and request that this Court overturn the judgment of the Tennessee Supreme Court in the DNA Denial. So, they are barred by the *Rooker-Feldman* doctrine, and therefore the Court—as with Claim One and Claim Two—lacks subject-matter jurisdiction to adjudicate them. *Durham*, 528 F. App'x at 564 ("[w]here the plaintiff alleges that a state court interpreted and applied a state statute

---

doctrine); *Cromartie v. Shealy*, No. 7:19-CV-181 (MTT), 2019 WL 5553274, at *2-3 (M.D. Ga. Oct. 28, 2019) (finding challenge to state court application of postconviction DNA testing procedures barred as a challenge to a state court "judgment"), *aff'd*, 941 F.3d 1244 (11th Cir. 2019).

[33] Herein, the Court generally uses the terms "state-court decision" and "state-court judgment" interchangeably. Consistent with the prior footnote, the Court notes that the Fingerprint-Act Denials and the DNA Denial are state-court judgments for the purposes of considering the extent to which the *Rooker-Feldman* doctrine bars Plaintiff's challenges.

to her case in an unconstitutional manner, her complaint is an as-applied constitutional challenge and is prohibited under the *Rooker–Feldman* doctrine."); *Smith*, 2022 WL 1182699, at \*7 (claim barred by the *Rooker-Feldman* doctrine when it was clear that the plaintiff "specifically and directly challenges the state courts' adverse determination of his motion for relief under the [] the DNA Act.").

Given this lack of subject-matter jurisdiction over Plaintiff's claims in Claim One, Claim Two, Claim Three and Claim Five, Plaintiff lacks the significant likelihood of success on the merits of these claims, and his request for a stay of execution in his Motions based on these particular claims cannot be granted. *See e.g., Smith*, 2022 WL 1182699, at \*9 (finding, after concluding that the Court lacks subject-matter jurisdiction to consider a plaintiff's claims, that "plaintiff has no likelihood of prevailing on the merits of his claims and is not entitled to injunctive relief [in the form of staying an execution.").[34]

---

[34] The Court wishes to explain somewhat more fulsomely just why Plaintiff's claims in Claim One, Claim Two, Claim Three and Claim Five are barred by the *Rooker-Feldman* doctrine, and not saved by *Skinner*'s holding that where a plaintiff challenges a statute as "authoritatively construed" by state courts, such a challenge is not barred by the *Rooker-Feldman* doctrine. 562 U.S. at 532.

Plaintiff contends that his claims in Claim One and Claim Two merely challenge the Fingerprint Act as authoritatively construed by Tennessee courts. (Doc. No. 33 at 3). He also and might contend, though not doing so explicitly in the briefing on the Motions, that Claim Three and Claim Five merely challenge the DNA Act and Rule 12.4(E) as authoritatively construed by the Tennessee courts. As a result, (this argument goes), *Skinner* dictates that these two (or perhaps four) claims are *not* barred by the *Rooker-Feldman* doctrine. The crux of this argument seems to be based on the following language from *Skinner*:

> [The plaintiff] does not challenge the adverse [state court] decisions themselves; instead, he targets as unconstitutional the [] statute they authoritatively construed. As the Court explained [] a state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action. [The plaintiff's] federal case falls within the latter category. There was, therefore, no lack of subject-matter jurisdiction over [plaintiff's] federal suit.

*Skinner*, 562 U.S. at 532-33

Here, given the substance of Claim One, Claim Two, Claim Three and Claim Five, the Court cannot conclude that *Skinner* saves any of these claims from the *Rooker-Feldman* doctrine. Indeed, Plaintiff's allegations with respect to these claims make clear that he is not seeking to challenge a future application or construal of either of the statues at issue (or Rule 12.4(E)). Instead, as the Court has already explained at

Nevertheless, that still leaves Claim Four, which is a challenge to the DNA Act as allegedly it will be applied to him (namely, in the consideration of the Second DNA Motion in particular) by Tennessee courts in light of how they allegedly have construed the DNA Act in the past. As noted above, Claim Four is based not on a past application of the DNA Act to Plaintiff by the Tennessee courts, but instead on what Plaintiff alleges is an "imminent threat that his due process rights will be violated when the Tennessee courts follow their longstanding practice of refusing to consider evidence discovered since trial when evaluating the exculpatory value of DNA evidence in his case— specifically in evaluating his Second DNA Motion." (Doc. No. 32 at ¶ 181). Uniquely among his three claims arising out of his quest for DNA analysis (Claim Three, Claim Four, and Claim Five), Claim Four asserts a violation of procedural due process from Tennessee courts' future application (in the ongoing adjudication of the Second DNA Motion) of the DNA Act to

---

some length, Plaintiff's claims in Claim One, Claim Two, Claim Three, and Claim Five clearly seek a review of the judgments of the Tennessee Criminal Court for Shelby County and the CCA denying Plaintiff's requests for fingerprint analysis and of the Tennessee Supreme Court denying Plaintiff's request for DNA analysis.

Indeed, Plaintiff's claims that the Court has found barred by the *Rooker-Feldman* are analogous to claims considered by the Fifth Circuit in *Rhoades v. Martinez*, No. 21-70007, 2021 WL 4434711 (5th Cir. Sept. 27, 2021). In that case, the Fifth Circuit considered a claim brought by a plaintiff challenging a state judge's ruling "denying him a statutory right to access jury materials from his [criminal] trial." *Id.* at *1. Where the plaintiff was plainly challenging a state-court *judicial* ruling, the Fifth Circuit concluded that the *Rooker-Feldman* doctrine barred the claim (and that *Skinner* did not suggest otherwise), because plaintiff was "in essence [calling upon the federal court] to review a state court decision." *Id.* at *2.

Likewise, in *Simpson v. Quick*, No. 26-6008, 2026 WL 297077 (10th Cir. Feb. 4, 2026), *cert. denied*, 223 L. Ed. 2d 587 (Feb. 11, 2026), the Tenth Circuit found a plaintiff's claim barred by the *Rooker-Feldman* doctrine where the relief he sought would in effect reverse or invalidate a prior state-court judgment, *id.* at *3, even though plaintiff specifically alleged that although "State law gave [him] the right to challenge [a] statute . . . the procedural process rendered that right meaningless." *Id.* In ultimately determining that the plaintiff's claim was barred by the *Rooker-Feldman* doctrine, the Tenth Circuit reasoned that the source of the plaintiff's injury was a judicial ruling. *Id.*

What's more, as Judge Trauger has previously noted, in the case of a plaintiff who "specifically and directly challenges the state courts' adverse determination" and insists that he "is entitled to relief based on the actions taken by the Tennessee state courts," such challenges are barred by the *Rooker-Feldman* doctrine, and do not fall within the ambit of *Skinner*. *Smith*, 2022 WL 1182699, at *7. With respect to all claims but Claim Four, Plaintiff appears to be just such a plaintiff, given those claims' challenges to the Fingerprint-Act Denials and the DNA Denial.

restrict (based on Tennessee courts' prior construal of the DNA Act) the consideration of evidence that emerged *after* trial when considering a request for DNA analysis. (Doc. No. 32 at ¶¶ 175-76). This claim is not barred by the *Rooker-Feldman* doctrine, because Claim Four implicates no prior state-court judgment that Plaintiff seeks to invalidate. Rather, as noted earlier, Plaintiff merely seeks relief from the purported unconstitutionality of the DNA Act as will allegedly be applied to Plaintiff in the future (in the Tennessee courts' ongoing adjudication of the Second DNA Motion) in light of how the Tennessee courts allegedly have construed the DNA Act in the past. *Hall*, 727 F.3d at 455 n.3 ("the *Rooker–Feldman* doctrine does not bar as-applied constitutional challenges seeking prospective relief as long as 'the source of [the plaintiff]'s alleged injury is not the past state court judgments' but 'the purported unconstitutionality of [the statute] as applied in future cases.'" (quoting *Fieger*, 471 F.3d at 646)). And indeed, Plaintiff's claim in Claim Four challenging the DNA Act as applied in future cases is squarely within the category of cases that the Supreme Court in *Skinner* and in later cases described as *not* barred by the *Rooker-Feldman* doctrine. *See Reed v. Goertz*, 598, U.S. 230, 235 (2023) (finding a claim not barred by *Rooker-Feldman* doctrine where the claim did "not challenge the adverse state-court decisions themselves, but rather targets as unconstitutional the [state] statute they authoritatively construed." (internal quotation marks and citations omitted)).

Accordingly, given that the *Rooker-Feldman* doctrine bars neither Claim Four nor (as noted earlier) any facial challenges that Plaintiff ostensibly may have asserted, the Court will next address the merits of Claim Four and then the merits of Plaintiff's facial challenges. As this analysis reveals, Plaintiff has failed to demonstrate a significant likelihood of success on the merits

of these claims so as to be entitled to a stay of execution. [35] [36]

[35] The Court notes that the State Defendants assert that the Court lacks subject-matter jurisdiction over Plaintiff's request to stay his execution based on one other ground: standing. (Doc. No. 24 at 17-18). The crux of the State Defendant's argument here is that one defendant—Jonathan Skrmetti—has responsibility for ordering or turning over forensic analysis like the fingerprint and DNA analysis requested by Plaintiff, but two other defendants—Frank Strada and Kenneth Nelson—have responsibility for actually carrying out Plaintiff's execution. In other words, the State Defendants contend that Plaintiff's (alleged) injuries—a denial of fingerprint and DNA analysis—is traceable to Jonathan Skrmetti—but that those injuries are not *actually* redressable by a stay of execution. Instead (according to the State Defendants), those injuries are redressable only by a completion and disclosure of the fingerprint analysis and DNA analysis that Plaintiff has requested. Moreover, the State Defendants also contend that it would be improper for the Court to enjoin Frank Strada and Kenneth Nelson from executing Plaintiff because Plaintiff's injuries—that is the denial of fingerprint or DNA analysis—are not actually traceable to Frank Strada and Kenneth Nelson. Thus, according to the State Defendants, Plaintiff does not have standing to seek a stay of his execution. The Court need not now address this argument with respect to Claims One, Two, Three and Five, because it has already determined on alternative grounds—namely the *Rooker-Feldman* doctrine—that it lacks subject-matter jurisdiction over these claims. But it has made no such determination with respect to Claim Four.

But as to Claim Four, the pendency of the State Defendants' argument as to standing may understandably raise in observers' minds the question of whether, at this juncture, the Court should even be deciding (as to Claim Four) a motion for a preliminary injunction (i.e., stay of execution), prior to resolving the issue of whether it has subject-matter jurisdiction (i.e., whether Plaintiff has standing to pursue a stay of execution) to actually issue that injunctive relief. The short answer—as this Court has explained in the past, *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 704 n.26 (M.D. Tenn.), *aff'd on other grounds sub nom. Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378 (6th Cir. 2020)—is that the Court may do so, provided that the Court's decision is to *deny* rather than *grant* preliminary injunctive relief. The Court realizes that it cannot grant a preliminary injunction prior to resolving a colorable challenge to subject-matter jurisdiction. *See, e.g., Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 384 (E.D.N.Y. 2016) (collecting authorities). Indeed, it is obvious that a court should not exercise judicial authority to compel a defendant, via an injunction, to do or not to do something if the court lacks authority to exercise affirmative judicial power. And a lack of subject-matter jurisdiction is a lack of precisely this kind of affirmative authority. But a refusal to exercise affirmative judicial power is another matter entirely; if the court's decision is to deny a request for a preliminary injunction, the concerns about unauthorized use of judicial power are not present in the same way. For this reason, it appears that the Sixth Circuit permits a district court to *first* deny a motion for a preliminary injunction and *then* resolve a challenge to subject-matter jurisdiction. *See Freeman v. Helldoerfer*, 208 F.3d 213 (6th Cir. 2000) (affirming district court's denial, in a case removed from state court, of a motion for preliminary injunction prior to the court's remand to state court based on the district court's lack of subject-matter jurisdiction). Thus, the Court does not hesitate to issue this order denying the request for a stay of execution before addressing (and taking the time to address) the standing issues that the State Defendants have raised; indeed, so doing seems especially warranted given the obvious time sensitivity concerning the resolution of the instant Motions.

[36] The State Defendants also argue that the Court cannot issue a stay of execution, because (according to the State Defendants) Plaintiff's request for a stay of execution is "unmoored from [his] claims." (Doc. No. 24 at 9). The basis of this argument is that (according to the State Defendants) Plaintiff's claims—geared as they are at efforts to obtain fingerprint analysis and DNA analysis—do not ultimately challenge Plaintiff's *underlying* conviction or death sentence. In other words, again according to the State Defendants, "[s]uccess in the suit gains for [Plaintiff] only access to the [requested] evidence, which may prove

exculpatory, inculpatory, or inconclusive." (Doc. No. 24 at 10 (quoting *Skinner*, 562 U.S. at 525)). Put another way, and as the State Defendants argue:

> To upend his death sentence, [Plaintiff] would have to prevail here, obtain "testing [that] exonerates him," and then "bring an entirely separate suit or a petition for clemency to invalidate his conviction." *Osborne*, 557 U.S. at 66. No judgment in this Section 1983 lawsuit could ever stop [Plaintiff's] execution. *Skinner*, 562 U.S. at 534.
>
> So there is no fit between relief and claims. Whether [Plaintiff] will be executed "deals with a matter lying wholly outside the issues in th[is] suit." *De Beers*, 325 U.S. at 220. Where "the ultimate legal claim" is that Tennessee must produce evidence to [Plaintiff] for testing—not that it may not constitutionally execute him—"there is no basis for enjoining" that execution. *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 32-33 (2008). In short, the mismatch between [Plaintiff's] claims and his requested emergency relief dooms his motion.

(Doc. No. 24 at 10 (footnotes omitted)). The Court sees where the State Defendants are coming from here, but the Court is not convinced that it must refrain from staying the execution based on this particular argument. Indeed, as this Court (per Judge Trauger) reasoned when considering a request for a stay of execution predicated on purported constitutional violations in connection with post-conviction procedures (namely, in that particular case, the DNA Act):

> [One] purpose of a preliminary injunction is to preserve a court's power to render a meaningful decision after a trial on the merits. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005) (quoting Wright, Miller & Kane, *11A Federal Practice and Procedure: Civil* § 2946 (3d ed.) ("Wright & Miller")). Generally, a "preliminary injunction is appropriate whenever the policy of preserving the court's power to decide the case effectively outweighs the risk of imposing an interim restraint before it has done so." Wright & Miller § 2947. Failure to enjoin an imminently pending execution will obviously render the case moot as to the inmate long before any trial can be held. Nevertheless, stays of execution are not to be granted routinely. A court must weigh the interest of a state in carrying out a lawful death sentence and its parallel interest in the finality of criminal judgments. *Workman*, 486 F.3d at 912–13.

*Smith*, 2022 WL 1182699, at *2. The upshot is that the State Defendants' argument here is too broad, at least at the present stage. The State Defendants seem argue that a stay of execution is *per se* improper if the final relief that a plaintiff could receive in a lawsuit would not necessarily undermine that execution. However, the Court is not comfortable at this stage recognizing such an expansive argument without further analysis of the particular claims that survive the *Rooker-Feldman* doctrine or the liberty interests advanced in those surviving claims. Thus, at least at this juncture—at which time the Court cannot even tell what liberty interest(s) Plaintiff contend(s) is/are implicated by those claims, as discussed below—the Court finds that the State Defendants' argument here does not establish a lack of authority for the Court to enjoin Plaintiff's execution.

The Court notes that below it will analyze various liberty interest(s) that *could* be the liberty interest(s) that underlie(s) Plaintiff's claims (including Claim Four)—although as explained below the Court is unable to discern clearly just what liberty interest(s) actually underlie(s) those claims. The Court will also discuss the mismatch between one of those potential underlying liberty interest(s) and Plaintiff's requested stay of execution. However, the Court notes that its analysis below does not undercut its conclusion in this footnote that the State Defendants' argument (the argument detailed just above) is too broad to justify the Court declining to grant Plaintiff's request for a stay of execution based directly and specifically on this argument.

Via Claim Four, Plaintiff claims that the DNA Act, as allegedly it will be applied to him by Tennessee courts in light of how they allegedly have construed the DNA Act in the past, is violative of procedural due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. Before addressing the merits of Claim Four, the Court will first provide an overview of the legal framework underlying procedural due process claims, such as the claim Plaintiff brings in Claim Four.

### i. Procedural Due Process Generally

In evaluating procedural due process claims, a court addresses the first and, if necessary, the second of two questions: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Bazzetta v. McGinnis*, 423 F.3d 557, 563 (6th Cir. 2005) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). As suggested by the above inquiry, there are really three steps to establishing a procedural due process violation. A plaintiff must show "that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014).

State laws like "Tennessee's Post-Conviction DNA Analysis Act may [(not to say always *do*)] create a liberty interest in accessing biological evidence for testing." *Elsea v. Pinkston*, No. 1:19-CV-00287, 2020 WL 4043982, at *2 (E.D. Tenn. June 18, 2020) (citing *Castanon v. Johnson*, No. 12-5497, 2012 WL 10236221, *1 (6th Cir. Dec. 19, 2012)), *report and recommendation adopted,* No. 1:19-CV-287, 2020 WL 4041112 (E.D. Tenn. July 17, 2020). However, "[a]lthough the Supreme Court has recognized that state laws providing for post-conviction DNA testing may

[(again, not to say always *do*)] create a liberty interest in accessing biological evidence for testing, '[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.'" *Castanon v. Johnson*, No. 12-5497, 2012 WL 10236221, at *1 (6th Cir. Dec. 19, 2012) (quoting *Dist. Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. 52, 68–70 (2009)). The level of process a state must afford to a criminal defendant proved guilty and seeking post-conviction relief is not as exacting as that which must be afforded in other contexts.[37] As the Supreme Court explained:

> A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt. But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera v. Collins,* 506 U.S. 390, 399, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). "Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty." *Dumschat, supra,* at 464, 101 S.Ct. 2460 (internal quotation marks and alterations omitted).

> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. "[W]hen a State chooses to offer help to those seeking relief from convictions," due process does not "dictat[e] the exact form such assistance must assume." *Pennsylvania v. Finley,* 481 U.S. 551, 559, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). [A plaintiff's] right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. *Brady* [*v.* Maryland, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution")] is the wrong framework.

> Instead, the question is whether consideration of [plaintiff's] claim within the framework of the State's procedures for postconviction relief "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation." *Medina v. California,* 505 U.S. 437, 446, 448, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (internal quotation marks omitted); see *Herrera, supra,* at 407–408, 113 S.Ct. 853 (applying *Medina* to postconviction relief for

---

[37] Indeed, in laying out what procedure a criminal defendant provided guilty is entitled to in these circumstances, the Supreme Court entirely eschewed the use of the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), instead using the more exacting test, quoted above, from *Medina v. California,* 505 U.S. 437 (1992).

actual innocence); *Finley, supra,* at 556, 107 S.Ct. 1990 (postconviction relief procedures are constitutional if they "compor[t] with fundamental fairness"). Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.

*Osborne*, 557 U.S. at 68-69. The dissent in *Osborne* noted that the test embraced by the majority (from *Medina*) is more "exacting" (i.e., demanding) for Section 1983 plaintiffs than the test generally used to assess whether procedures were inadequate to satisfy due process, i.*e.,* the test from *Mathews v. Eldridge,* 424 U.S. 319 (1976) (prescribing a three-part balancing test for that assessment). *See Osborne*, 557 U.S. at 90 n.3 (Stevens, J., dissenting). The upshot is that the Supreme Court has made clear that when it comes to the specific context of a convicted criminal defendant (like Plaintiff here) seeking to protect a liberty interest in post-conviction relief, the procedures in place merely must not offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," transgress "any recognized principle of fundamental fairness in operation," or be "fundamentally inadequate to vindicate the substantive rights provided." *Id.* at 69. It bears reiterating that this is—from the perspective of a Section 1983 plaintiff like Plaintiff— position a "more exacting test" than the test in *Mathews. See Osborne*, 557 U.S. at 90 n.3 (Stevens, J., dissenting).

With the above-referenced principles in mind, the Court will now turn to Plaintiff's procedural due process claim challenging the DNA Act as applied in future cases.

### ii. Merits-Based Analysis of Claim Four

As an initial matter, the Court must accurately identify the particular liberty interest implicated here, meaning the purported liberty interest of which Plaintiff allegedly has been deprived. In support of Claim Four, Plaintiff alleges in the Amended Complaint that Plaintiff "has a liberty interest in utilizing state procedures to demonstrate his innocence and/or seek a reduction of his sentence." (Doc. No. 32 at ¶ 173). But in his briefing requesting a stay of his execution,

Plaintiff seems to recharacterize that interest—albeit in a reference made in terms of the Fingerprint Act rather than the DNA Act—as "a liberty interest in demonstrating his innocence with new evidence under state law that creates avenues for doing so." (Doc. No. 3 at 4).[38] In the Court's view, these two things are not the same. In the first articulation of the liberty interest, the liberty interest is in *utilizing state procedures* (to do something, namely, "demonstrate his innocence and/or seek a reduction of his sentence"); the focus manifestly is on the plaintiff *being able to use state procedures*. In the second articulation, the liberty interest is "in demonstrating his innocence" (in a particular manner, namely, "with new evidence under state law that creates avenues for doing so"); the focus manifestly is on the plaintiff *being found innocent (and treated accordingly)*.

A liberty interest in utilizing state procedures (for whatever purpose) is a liberty interest that is *created by the state's very adoption of those state procedures*. A liberty interest of a convicted (and, here, incarcerated and condemned) prisoner in being found innocent is an interest in (among other things) not being incarcerated in the future; this liberty interest does not depend upon the existence of state procedures, but rather *exists inherently* because if having liberty means anything, it means not being incarcerated. So the two alternative liberty interests posited by Plaintiff are entirely different.

Moreover, based on the current record, there is certainly the possibility that Plaintiff is proposing that the applicable liberty interest is *something else*, such as a liberty interest in obtaining his requested DNA analysis under the DNA Act, or perhaps a "compound" liberty interest along

---

[38] For a due process claim to succeed, it obviously has to be grounded on a particular, readily identifiable, liberty interest. Otherwise, it is hard not only to conclude that an applicable liberty interest existed, but also to conclude that there was a deprivation of that interest and that any such deprivation was in violation of due process. So it is not hard to perceive, from Plaintiff's apparent uncertainty as to the identity of the applicable liberty interest, that his due process claim is imperiled from the outset.

the lines of an interest in (i) utilizing the state procedures created by the DNA Act *and* obtaining his requested DNA analysis; or (ii) obtaining his requested DNA analysis *and* as a result being found (and treated as) innocent; or (iii) utilizing the state procedures created by the DNA Act so as to (first) obtain his requested DNA analysis and (second) as a result being found innocent.[39] Or perhaps the purported liberty interest is not an interest in being found innocent (thus resulting in release from incarceration), but rather a narrower interest simply in having a fair or reasonable opportunity to establish his innocence post-conviction

The inability of the Court to identify the applicable liberty interest, far from being merely an academic concern or a matter of semantics, has real and practical consequences for the analysis of Claim Four. First, whereas it is entirely clear *ab initio* that Plaintiff has been deprived of the liberty interest in being found (and treated as) innocent, a disciplined analysis would be required for the Court to determine that Plaintiff (at least likely) has been or will be deprived of the right to utilize whatever state procedures were created by the DNA Act—as opposed to being denied DNA analysis in a manner that is entirely consistent with the DNA Act after having utilized (albeit unsuccessfully) the state procedures contemplated by the statutes that created the liberty interest in the firm place. Second, (i) the question of whether the state "afforded adequate procedural rights," *Daily Servs. LLC*, 756 F.3d at 904, before denying a plaintiff an interest in being found and treated as innocent after conviction (and thus no longer subject to deprivation of liberty via incarceration) is entirely different from (ii) the question of whether the state afforded adequate procedural rights before (allegedly) denying the plaintiff an interest in utilizing state procedures.

---

[39] Any such "compound" (i.e. two-part or perhaps even three-part) liberty interest strikes the Court as ill-advised, as it would create analytical permutations that would impair Plaintiff's ability to do clearly what Plaintiff needs to do: (i) establish a cognizable liberty interest; (ii) demonstrate a deprivation of that liberty interest; and (ii) show that the state did not afford adequate procedural rights prior to the deprivation of that liberty interest.

Furthermore, depending on what the underlying liberty interest is, Claim Four well may be legally flawed for additional reasons. That is, to the extent that the liberty interest underlying Claim Four is an interest in no longer being incarcerated (by virtue of being found innocent), the claim should have been brought in *habeas*, and not under *Section 1983*. *Kitchen v. Whitmer*, 106 F.4th 525, 540 (6th Cir. 2024) ("We have reiterated the importance of making sure prisoners do not use vehicles other than habeas to invalidate their sentences."); *id.* at 543-44 ("[T]he court cannot grant Kitchen the relief he seeks without undercutting his sentence. This sort of [requested relief] lies in the province of habeas, not § 1983.").

On the other hand, to the extent that the applicable liberty interest is more limited—an interest in utilizing state-created procedures pursuant to the DNA Act or an interest in obtaining DNA analysis pursuant to the DNA Act—then vindication of that liberty interest is ultimately unrelated to the request for a stay of execution and thus cannot support such a stay of execution. In *Durr v. Cordray*, 602 F.3d 731 (6th Cir. 2010), the Sixth Circuit first found that the claim of the plaintiff (Durr, a condemned prisoner) seeking DNA evidence was cognizable under Section 1983 (such that it did not need to be brought in habeas and there face the bar against a second or successive habeas petition). *Id.* at 736. The court continued:

> But we find that we cannot grant Durr a stay of his execution for these very same reasons: success on his claim would do no more than yield access to the evidence, it would have no direct effect on the validity of his conviction or death sentence, and he would have to bring another, separate action in order to even challenge the conviction or sentence. That is, *even if* Durr were to prevail on his § 1983 action (and obtain the necklace for DNA testing), success in that action would not directly invalidate or undermine his conviction or sentence. Consequently, there is no nexus between the merits of Durr's underlying claim and his pending execution, so this claim—no matter its merit—cannot justify our interference with the State's enforcement of an otherwise uncontested judgment of conviction and sentence.

*Id.* at 736-737. As noted in a footnote above, the Court declines for now to treat the kind of lack of nexus described in *Durr* as by itself necessarily requiring rejection of Plaintiff's request for a

stay of execution. Nevertheless, the Court draws from Durr an important lesson: if the alleged liberty interest underlying Claim Four is the interest in being declared innocent (so as to invalidate his conviction, current incarceration, and pending death sentence), then it is simply not an interest directly implicated by mere denial of access to DNA evidence (or, for that matter, access to DNA analysis or to adequate procedures for obtaining DNA evidence). So, it cannot possibly be an interest of which Plaintiff was deprived directly via a denial of access to DNA analysis or of adequate procedures for obtaining a DNA analysis.

In short, to assess the extent to which Claim Four is flawed due potentially to, for example, lack of nexus to Plaintiff's request for a stay of execution or its non-cognizability in a Section 1983 (as opposed to habeas) action, the Court simply needs to know what the liberty interest is. And yet it cannot tell what it is.

Given that Plaintiff has failed to make clear what the allegedly violated liberty interest even is, Plaintiff has not shown a likelihood that he can establish as required that the alleged violated liberty interest exists (and can properly be vindicated via an action under Section 1983 rather than in habeas), or that the liberty interest bears an adequate nexus to the requested stay of execution, or that Plaintiff was deprived of that liberty interest, or that the state deprived Plaintiff of it without affording adequate procedural rights. So the request for a stay is subject to denial on this basis.

The Court is aware how much is at stake here—for both sides, but especially for Plaintiff. But precisely because the stakes are so high, and because the requested stay is an extraordinary remedy, Plaintiff's claims need to be very sound. And they simply are not when the Court cannot even ascertain what the applicable liberty interest is. Accordingly, Claim Four fails to support

Plaintiff's request for a stay of execution.[40]

### c. Facial Claims

That leaves Plaintiff's facial claims, such as they are. The Court discerns that Plaintiff purports to facially challenge the Fingerprint Act, DNA Act and (potentially) Rule 12.4(E) as construed by the Tennessee courts. Such a challenge is cognizable under Section 1983, *Skinner*, 562 U.S. at 533, and is not barred by the *Rooker-Feldman* doctrine. *Carter*, 524 F.3d at 798; *Skinner*, 562 U.S. at 532-33.

Turning to the likelihood of success on the merits of Plaintiff's facial claims, a "facial challenge to a law's constitutionality is an effort 'to invalidate the law in each of its applications, to take the law off the books completely.'" *Speet v. Schuette*, 726 F.3d 867, 871-72 (6th Cir. 2013) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009)). Indeed, "[i]n contrast to an as-applied challenge, which argues that a law is unconstitutional as enforced against the plaintiffs before the court, a facial challenge 'is not an attempt to invalidate the law in a discrete setting but an effort to leave nothing standing[.]'" *Id.* To succeed on a facial attack, a plaintiff must establish "'that no set of circumstances exists under which [the statute] would be valid.'" *United States v. Stevens,* 559 U.S. 460, 472 (2010) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)). Alternatively, a plaintiff may succeed on a facial challenge by showing that a statute lacks a "plainly legitimate sweep." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997)). *See also Speet*, 726 F.3d at 872.[41]

---

[40] The Court notes that many of its observations regarding the merits of Claim Four might have proved applicable to the other four claims, had they not been barred by the *Rooker-Feldman* doctrine and thus been assessed on the merits.

[41] It is unclear if any of Plaintiff's facial ostensible challenges to the Fingerprint Act, DNA Act, or Rule 12.4(E) are based on the First Amendment. "Where a plaintiff makes a facial challenge under the First Amendment to a statute's [or rule's] constitutionality, the 'facial challenge' is an 'overbreadth challenge.'" *Speet*, 726 F.3d at 872 (quoting *Connection Distrib. Co.*, 557 F.3d at 335). When bringing a First

Here, the Court cannot conclude that Plaintiff has a significant likelihood of success on the merits of his facial challenges so as to warrant the Court granting Plaintiff's request for a stay of execution based on these claims. Indeed, in the Amended Complaint Plaintiff makes no real effort to show that there are no set of circumstances under which the Fingerprint Act, DNA Act, or Rule 12.4(E) (as construed by the Tennessee courts) would be valid, or that these statutes or this rule lacks a plainly legitimate sweep. Indeed, in the Amended Complaint it appears that Plaintiff makes his facial challenges only in passing. (Doc. No. 32 at ¶ 6). What's more, Plaintiff's briefing on the Motions does not mention these facial claims even once.

Plaintiff appears to "merely leave[] it to the Court to put flesh on the bones of [his facial] claims, which it cannot do." *Brow Art Mgmt., LLC v. Idol Eyes Franchise, LLC*, No. CV 23-11434, 2023 WL 4665357, at *9 (E.D. Mich. July 20, 2023) (citing *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022)). *See also Ellis v. Arrowood Indem. Co.*, No. CIV. 12-140-ART, 2015 WL 2061936, at *4 (E.D. Ky. Apr. 30, 2015) ("It is not the Court's job—nor, arguably, prerogative—to put flesh on the bones of so skeletal an argument." (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)). In other words, without more the Court cannot conclude that Plaintiff has a significant likelihood of success on the merits of his facial claims.

Accordingly, the Court concludes that Plaintiff does not have a significant likelihood of success on the merits of his facial claims. And with this conclusion, the Court has found that Plaintiff has not demonstrated a significant likelihood of success on the merits of any claims in

---

Amendment facial challenge, rather than "having to prove that no circumstances exist in which the enforcement of the statute would be constitutional, the plaintiff bears a lesser burden: 'to demonstrate that a 'substantial number of instances exist in which the law cannot be applied constitutionally.'" *Id.* at 872 (quoting *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012)).

To the extent that Plaintiff is attempting to make a First Amendment facial challenges to the Fingerprint Act, DNA Act, or Rule 12.4(E), these challenges fail to support Plaintiff's request for a stay of execution because Plaintiff has made no effort to meet the aforementioned standard for First Amendment facial challenges.

this action.

Therefore, Plaintiff has failed to establish the first requirement for a stay of execution to be issued, and Plaintiff's request to stay his execution will be denied. Given that the Court has concluded that Plaintiff has not satisfied the first requirement for a stay of execution and that the Court may and will deny Plaintiff's request to stay his execution on those grounds, the Court will not analyze any of the other three requirements for a stay of execution. *See Smith*, 2022 WL 1182699, at *12 (declining to conduct further analysis of whether a stay of execution is warranted because plaintiff failed to establish a likelihood of success on the merits of his underlying claims).

2. Plaintiff's Request to Stay this Litigation

That leaves Plaintiff's request to stay this litigation, made in the Second Motion.[42] Plaintiff requests a stay of this litigation pending the decision of the Tennessee courts on the Second DNA Motion and argues that it is in "the interest of judicial economy, to avoid duplicative simultaneous litigation, and to confirm that all avenues for relief in state court have been explored before litigation in this Court proceeds." (Doc. No. 22 at 3).

The Court has broad discretion to consider whether to issue a stay. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Latta v. U.S. Dep't of Educ.*, 653 F. Supp. 3d 435, 439 (S.D. Ohio 2023) (noting that inherent in a district court's discretion to stay proceedings is the ability "to consider *sua sponte* whether to issue a stay." (citing *Collins on Behalf of Collins v. Barry*, 841 F.2d 1297, 1299 (6th Cir. 1988))). *See also Knapp v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:19-CV-00542, 2021 WL 879126, at *4 (M.D. Tenn. Feb. 8, 2021) (noting

---

[42] The Court notes that a lay observer may wonder what the point would be of filing an action, only thereafter to promptly seek to stay the action. The Court can imagine a strategic rationale for doing so but notes that any such rationale is not material to the Court's decision on the motion to stay the litigation.

that the "Court has the inherent power to manage its own docket" and that because of pending litigation before the Sixth Circuit, the Court would deny a motion for costs "without prejudice to be[ing] refiled after completion of the appellate process." (citing *Webster v. Spears*, 664 F. App'x 535, 539 (6th Cir. 2016); *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 516–17 (6th Cir. 2003))). Indeed, as the Sixth Circuit has held, the power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants," and "the entry of such an order ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014). And the Court has "the authority to stay an action to prevent duplicative litigation." *Jaiyeola v. Rivian Auto., LLC*, No. 1:23-CV-263, 2023 WL 12187998, at *1 (W.D. Mich. May 30, 2023). *See also Gibson Guitar Corp. v. Wal-Mart Stores, Inc.*, No. 3:08CV0279, 2008 WL 3471844, at *1 (M.D. Tenn. Aug. 8, 2008) (staying litigation "to avoid duplicative action and [to] conserve judicial resources.").

The Court does not discern that it would be a wise use of its discretion to stay this action. Indeed, although Plaintiff requests a stay pending the disposition of the Second DNA Motion in state court so as to avoid duplicative federal and state litigation, not all of Plaintiff's claims herein are predicated on Plaintiff's request for DNA analysis, and as noted above many of Plaintiff's claims herein actually arise out of Plaintiff's quest for fingerprint analysis. Thus, irrespective of Plaintiff's pursuit of DNA analysis via the Second DNA Motion in Tennessee state court, Plaintiff may pursue his claims related to fingerprint analysis in this Court without any duplicative litigation. Moreover, given that the Court is denying Plaintiff's request for a stay of execution, the Court concludes that a stay of this action at this juncture would not benefit Plaintiff the way it

would have if (as Plaintiff may have hoped at the time he requested a stay of this litigation) the Court had ordered a stay of the execution.

Therefore, Plaintiff's request for a stay of this litigation pending the disposition of the Second DNA Motion will be denied at this time.

CONCLUSION

Accordingly, and for the reasons stated herein, the First Motion (Doc. No. 3) and the Second Motion (Doc. No. 22) will be **DENIED** in their entirety.

An appropriate accompanying order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE